Fuld, J.
 

 The State in 1954 appropriated some 34 acres of property belonging to the claimants in Oyster Bay in connection with the construction of the Long Island Expressway. The Court of Claims made an award of over $672,000, consisting of about $557,000 as damages for the land and some $115,000 as interest from the date of taking. A divided Appellate Division affirmed the judgment. Although buildings were planned for the land, it was vacant at the time of the taking, and it is the State’s contention that the courts below erred (1) in basing the award upon a capitalization of income from a projected but nonexistent structure and (2) in accepting, as supporting evidence, market value data consisting of sales of other parcels of land said to be not comparable.
 

 It is established by affirmed findings that the claimants had been seeking, for about a year prior to the condemnation, an industrial site which a prospective tenant needed for the manufacture of electronics equipment. The claimants assembled an irregular shaped parcel of about 49 acres in area which they considered suitable for such purposes. After purchasing it and after succeeding in having the zoning changed to permit industrial development, they entered into a lease with the electronics manufacturer. The lease obligated the claimants to construct
 
 *90
 
 the necessary building improvements, according to certain specifications, under personally guaranteed penalty provisions up to a limit of $500,000. Upon completion of the improvements by the claimants, the lease provided, the lessee, whose financial responsibility was beyond question, was to take possession and commence paying to the claimants an annual net rental of $380,900 for 23 years.
 

 Plans and specifications had been prepared in sufficient detail to enable construction experts to estimate construction costs with reasonable certainty. The cost of construction was estimated not to exceed $3,062,000 which, with financing and overhead charges during construction, would total about $3,726,000. Necessary financing in the amount of $3,000,000 was obtainable. However, the taking intervened before any construction work had begun and, in appropriating 34 acres out of the 49-acre tract which the claimants had assembled, the State made performance of the lease impossible.
 

 One of the claimants’ witnesses estimated the total value of the hypothetically completed improvements and land by capitalizing the net rental income payable under the lease. Prom this total valuation he deducted the estimated cost of construction and other costs which would have been incurred, resulting in a land residual of $1,000,000. The claimants’ other witness used the same method of valuation but also took into consideration the sales of other industrial land in the county.
 

 The State contends that the claimants’ valuation procedures assume a possible income under the most ideal conditions. This is, in essence, the view expressed in the Appellate Division dissent; capitalization of the prospective income of an uncompleted project, it is said, in effect “ charges to the public authority condemning land an obligation to carry out a projected commercial enterprise on the land to a successful termination with no risk, no effort and no investment by the claimants ’ ’. And the dissenters conclude from this that the Court of Claims erred in capitalizing the projected improvement “ as though it had been actually carried out ” (17 A D 2d 335, 339).
 

 As we read the record, that is not what the Court of Claims did. Although that court wrote no opinion, it seems quite clear from its ultimate findings of value and from its other findings
 
 *91
 
 that it did not fall into the error of valuing the property by capitalizing the net rental income as might have been proper if the building had been completed and rent had commenced. The value which the court found — $557,365 as compared with the claimants’ estimated value of $1,056,695 and the State’s estimate of $257,615 — makes this evident. Nor does it appear that the Court of Claims was unmindful of the speculative elements in the claimants’ valuation case. The State maintains, and we believe the argument is a valid one, that, if the taking had not prevented fulfillment of the lease, construction costs might have exceeded estimates to an extent sufficient to lower substantially the land residual valuation. The Court of Claims found, as requested by the State, that construction cost estimates may vary as much as 20% and that the lessee had submitted to the claimants its own estimate of construction cost which was $4,400,875 or more than one third higher than the claimants’ estimates.
 

 It does not follow, however, that the Court of Claims erred in receiving the evidence of the lease, the prospective net rental income, the plans to develop the subject property and the evidence relating to construction costs. A sagacious and experienced prospective purchaser on the day of the taking would undoubtedly have taken into consideration the net rental income which might have been derived from this property if the taking had not intervened and if the executed lease had been fulfilled. That is not to say that he would give as much weight, if any, to the conjectured net rental income earnings of a hypothetical building neither erected nor required to be erected by any lease or agreement. That case is not before us. Nor would one expect the prospective purchaser to pay for the vacant land in suit an amount equal to the worth of the conjectured net rental income — deducting, of course, construction and other costs necessary to complete the building — for, then, he would be paying an amount which would preclude any profit. What the purchaser would pay for the property would undoubtedly be influenced by the extent to which the property had been exploited. The purchase price would also, and more directly, be determined by what other properties were selling for or by what competitive alternatives were available to the purchaser.
 

 
 *92
 
 To put it another way, the purchaser would make two different estimates: first, what rental income could be derived from the property; second, what would have to be paid to acquire the property, that is, its market value. Although these are different inquiries, we are persuaded that in the circumstances of this case, where the dealings in the property had been crystallized in binding agreement and were on the road to fulfillment, the prospective purchaser in determining the price to pay would have given careful consideration to the first, albeit subordinate, question of prospective rentals and it follows that the Court of Claims was justified in considering all these facts. (See, e.g.,
 
 Mattydale Shopping Center
 
 v.
 
 State of New York,
 
 303 N. Y. 974;
 
 United States
 
 v.
 
 25.406 Acres of Land,
 
 172 F. 2d 990, 992-994.)
 

 There is considerable evidence in the record with respect to other parcels of vacant land, suitable for industrial use, sold in Nassau County. These sales ranged, in price per acre, from $29,653 to $49,273. The parties in this case agree that an analysis of the land values found by the Court of Claims for the industrial land taken indicated an award of some $19,000 per acre.
 

 The State contends that these sales were of parcels so lacking in comparability that they should have been held incompetent as a matter of law, the chief objection being that these other properties were in an intensively developed part of Nassau County, eight miles nearer to New York City than the subject property. It would not have been at all unreasonable, we think, for a prospective purchaser of the industrial land in suit to have inquired concerning the selling price of industrial land in the same county, though nearer to New York City and probably more valuable than the subject property. Reception in evidence of such valuation data is not tantamount to a holding by the trier of fact that the selling prices so received are to be adopted as the ultimate value to be found for the subject property. Receiving evidence of sales of property beyond the immediate vicinity of the subject property is a matter resting in the sound discretion of the trial judge. (See
 
 United States
 
 v.
 
 25.406 Acres of Land,
 
 172 F. 2d 990, 994-995,
 
 supra.)
 

 We conclude, as did the Appellate Division, with the observation that the Court of Claims quite obviously did not accept either the evidence of claimants or that of the State at
 
 *93
 
 face worth but fixed a market value well within the range of the testimony.
 

 The judgment appealed from should be affirmed, with costs.
 

 Chief Judge Desmond and Judges Dye, Van Vooehis, Burke, Foster and Scileppi concur.
 

 Judgment affirmed.