Albert P. DICKER et al., Appellants,

v.

UNITED STATES of America, Appellee.

CERTAIN LAND IN SQUARE 378 IN THE DISTRICT OF COLUMBIA et al., Appellants,

v.

UNITED STATES of America, Appellee.

Nos. 18918, 19036.

United States Court of Appeals District of Columbia Circuit.

Argued May 4, 1965.

Decided Oct. 22, 1965.

Mr. George Cochran Doub, Washington, D. C., with whom Mr. Thomas A. Flannery, Washington, D. C., was on the brief, for appellants.

Mr. A. Donald Mileur, Atty., Dept. of Justice, with whom Mr. Roger P. Marquis, Atty., Dept. of Justice, was on the brief, for appellee. Asst. Atty. Gen. Ramsey Clark also entered an appearance for appellee in No. 18918.

Before BAZELON, Chief Judge, and DANAHER and BURGER, Circuit Judges.

BURGER, Circuit Judge:

These appeals arise out of condemnation proceedings in which the property owners were awarded $1,303,594 for real estate in Washington, D. C. The appeals are from the final judgment fixing compensation and from denial of a motion for a new trial on the ground of newly discovered evidence.

The United States filed its complaint and declaration of taking on January 18, 1963. It deposited $1,155,000 in the registry of the District Court as its estimate of just compensation for the property. Three earlier dates are relevant. The property had been acquired by the Appellants March 12, 1962, for one million dollars. At that time the property consisted of warehouses and unimproved lots. Subsequently, on August 8, 1962, after having solicited and received bids for the leasing of office space, the General Services Administration negotiated with the owners a five-year lease beginning May 16, 1963, subject to a comprehensive remodelling of the buildings, at an annual rental of almost $390,000, with an option in the Government to renew for five more years at $417,000 per year.

The lease required the owners to give a surety bond to the Government in the amount of one year's rent guaranteeing that the remodelled buildings would be ready for occupancy in accordance with the terms of the lease; it also provided for one thousand dollars a day liquidated damages for delay in performance. Before executing the lease the GSA had an appraisal made of the property and determined that the proposed lease would not be in violation of the Economy Act, which limits Government rentals to an annual rent of fifteen per cent of the value of the property. Thereafter, the owners obtained municipal approval for the remodelling and began some work.

On November 8, 1962, the Woodmen of the World Life Insurance Society entered into a written contract with the owners to purchase that portion of the property covered by the Government lease and to lease it back to the fee owners. This purchase and leaseback was in turn conditioned upon performance of the Government lease and actual occupancy thereunder. The purchase price on the sale and leaseback to the Insurance Society was to be $2,800,000 or the appraised value of the property after remodelling, whichever was the lesser; rent for the leaseback was set at 7.74 per cent of the purchase price, sufficient to give the Insurance Society a six per cent net return and complete amortization in twenty-five years. The owners made a good-faith deposit of $14,000 in accordance with this agreement.

At the condemnation proceeding, where the only issue was just compensation as of January 18, 1963, controversy developed over the question, among others, as to the relevance of the lease and sale-leaseback agreements to market value at the date of taking.

The testimony of the real estate experts on value was, as is usual, in conflict. Government experts' appraisals ranged from $1,140,000 to $1,372,000. Both Government experts acknowledged that, although they knew about the Government lease and the commitment of the Insurance Society, they gave these contracts little or no weight in their appraisals because each was contingent.

Experts for the property owners gave opinions on value ranging from $2,577,000 to $2,962,000. The Government lease and the projected sale and leaseback agreement with the Insurance Society figured importantly in their testimony, and they and one of the Government experts testified extensively about the estimated cost of remodelling the buildings to meet the terms of the lease to the Government.

Appellants allege numerous errors: (a) It was error to rule in the pretrial order that "appraisal reports will not be exchanged and no additional [beyond mere names] discovery pertaining to these expert witnesses will be allowed." They challenge this order in the light of their post-trial claimed "discovery" that two real estate experts had rendered to the Government appraisals which substantially agreed with the Appellants' valuations and that the Government had "withheld" this information from the Appellants. Upon learning of this after trial, Appellants moved in the District Court for a new trial on the ground of newly discovered evidence; they allege as error the denial of this motion without hearing. (b) It was error to rule that the two agreements by the condemnees, one with the Government for the lease of the condemned property (subject to improvements) and the other with the Insurance Society for the sale and leaseback of the property, were admissible to show "highest and best use" of the property but not "as indicia of fair market value." (c) Also claimed as erroneous was the trial judge's ruling, which he changed on the last day of trial, excluding evidence of the amount actually expended by Appellants before the taking for renovation of the property pursuant to the lease agreement.

■ Appellants also contend error was committed in restricting the cross examination of one of Appellants' experts and in failing to strike that expert's testimony. Each of these two contentions is without merit. The Court ruled out cross examination which was repetitive and argumentative; the testimony was that of a duly qualified expert. Whether it was based on sound appraisal practice was of course subject to attack and the weight of the testimony was a matter for the jury to resolve.

■ Appellants' other contentions will be treated in the above order. (a) *Denial of pretrial examination of Government's appraisal reports:* The essence of Appellants' contentions on this score is that the Government had appraisals made by William F. Harps and Arthur M. Fisher and that subsequent to trial Appellants learned that Harps and Fisher each gave reports to the Government with appraisals of more than $2,000,000, the precise figures being unavailable to Appellants. But we note that before trial the parties were directed by the District Court to give each other the names of all experts each expected to call as witnesses. Appellants concede that they knew before trial that both Harps and Fisher had been employed by the Government. Therefore, it can hardly be contended that their testimony is "newly discovered evidence." When the Government's case closed without Harps and Fisher being called, Appellants had ample opportunity to take whatever steps they deemed in their interest to explore their views and to call them as witnesses if they chose.

■ Furthermore, even if the original denial of discovery had been error, a question we do not reach, the Appellants have not been prejudiced. Any testimony that Harps and Fisher might have given would have been cumulative only. That the Government consulted them but did not use their opinions is not relevant evidence of value; Appellants could not show the prior consultation in order to bolster the witnesses' credibility, nor could they seek to arouse jury prejudices by showing the prior consultation under the guise of proving the experts' qualifications. If Appellants wanted more expert testimony on value it was for them to produce such evidence.

■ (b) *Limitation on evidentiary weight of lease to Government and pro-*

*jected sale and leaseback with Insurance Society:* It is clear that the Government experts did not give weight to the GSA lease and the Insurance Society's commitment, but this was well known to the jury, who were also aware that Appellants' experts gave substantial weight to these factors. The District Judge's comments on these factors during trial were admittedly ambiguous and standing alone might constitute error. Nevertheless, in a comprehensive charge to the jury he made it plain that these two factors—the GSA lease and the Insurance Society's commitment—were evidence of the highest and best use of the property and that this in turn was relevant evidence bearing on the ultimate issue of value as of January 18, 1963.[1]

The Appellants were not entitled to an instruction that the sale and sale-leaseback agreements were *direct* evidence of market value rather than merely evidence of highest and best use, that being a factor for the jury to take into account in deciding the ultimate issue of value. See United States v. 25.406 Acres of Land, etc., 172 F.2d 990, 993 (4th Cir. 1949) (Parker, C. J.). When evidence is offered of a prospective use, as in this case, new elements of speculation enter the determination. Each of those elements reflects upon the feasibility of the prospective use as a highest and best use and, in turn, upon market value. See Levin v. State, 13 N.Y.2d 87, 242 N.Y.S. 2d 193, 192 N.E.2d 155 (1963) (Fuld, J.). Here those elements include the prospects for completion, the cost thereof, and the likelihood of a long-term market for office space in the area of the condemned property. We cannot say that the evidence in this case showed a prospective use so likely of successful consummation that it should be treated as already in effect and therefore direct evidence of fair market value, assuming, *arguendo,* prospective use can ever attain that status.

It is clear that the Court plainly linked "all elements of the highest and best use" arising out of the GSA lease and the Insurance Society sale and leaseback to value as of time of taking. The jury was told that these factors "and all other elements as might influence" a prudent purchaser, were to be taken into account in making the award. This corrected any prior confusion or ambiguity. We also note that in summation to the jury, Appellants' counsel vigorously and clearly presented the view, consistent with the Court's charge, that "highest and best use" as reflected by the GSA lease and the Insurance Society commitments, was evidence of market value. From the

---

1. Now, the jury is instructed that if any property is peculiarly adapted by its construction, improvements or intrinsic character to some particular use or uses which gives it a higher market value than it would otherwise have the circumstance or circumstances which make up such peculiar adaptability for such particular use or uses shall be considered, and the amount awarded as compensation for the property should be based upon its fair market value on January 18, 1963 in view of the most valuable use or uses for which it is shown the property is adaptable.

Now, by the most valuable use or uses to which the property can or may be put is meant either some existing use or one which the evidence shows is so reasonably likely in the near future that the availability of the property for that use would affect its present market value and would be taken into account by a purchaser under fair market conditions.

\* \* \* \* \*

In determining the value of the land, meaning buildings thereon, also you are not to consider or be influenced by the fact that these proceedings, that is, proceedings here in Court, are pending for the taking of the property. *You must consider all elements for the highest and best use of the property, including the lease to the United States, the lease which has been referred to in the evidence between General Services Administration and the property owners in question, as well as to the sale and the leaseback,* the sale being to the Woodmen of the World and the leaseback to the property owners, *and all other elements as might influence a reasonably prudent person interested in purchasing the property.*

R. 1166, 1168. (Emphasis added.)

arguments and charge, therefore, the jury could not have been in doubt on this score.

■ (c) *Exclusion of evidence of remodelling expense incurred by Appellants before taking*: Appellants correctly assert that the District Judge's pretrial order excluded evidence of expense incurred by Appellants before the taking, to improve and remodel the buildings in compliance with the lease terms. Assuming that this was error, the record shows that later during trial and before the close of Appellants' case, the District Court changed this ruling and advised Appellants that "the Court is perfectly willing to let them [Appellants] show any expenditure." [2] Appellants now contend that coming so late in the trial they could not accommodate themselves and prepare the evidence for submission. However, the statements of Appellants' counsel at the time of the change in the ruling show a belief on his part that such evidence would not be necessary. Even aside from those statements, Appellants' failure to request additional time or a recess discredits their claim on appeal that the reason they did not introduce evidence of renovation expense was unpreparedness resulting from reliance on the pretrial ruling. Therefore, this contention lacks merit.

Our examination of the record satisfies us that such ambiguities or error in rulings as occurred during trial were corrected and the issues were fairly and fully presented to the jury, and that the jury verdict represents a permissible choice among the alternatives available.

Affirmed.

2. (Mr. Liotta) [Counsel for Appellee] May my objection be noted to any cost coming in in this case? I respectfully submit that we are already into the frustration of their business plans and it will just accentuate it.
(The Court) The Court is perfectly willing to let them show any expenditure.
(Mr. Bernstein) [Counsel for Appellants] That is not the issue.
(The Court) I said you wanted the plans and costs in.
(Mr. Liotta) He said they paid a quarter of a million.
(Mr. Bernstein) You are changing the ruling now?

(The Court) Yes.
(Mr. Bernstein) Now, I am perfectly frank—we have the problem of whether we want, whether we might want to infect the record with error.
(The Court) You are the one that is—
(Mr. Bernstein) We do not think it is necessary.
(Mr. Liotta) You are referring to actual moneys paid, sir.
(The Court) That is right.
(Mr. Bernstein) Let me get a list and show Your Honor. I do not think we want to prove any of those. But I want to show Your Honor a list of that. R. 919–21.