**6816.5 ACRES OF LAND, MORE OR LESS, IN RIO ARRIBA COUNTY, STATE OF NEW MEXICO; William A. Maddox, individually and as Trustee under the Declaration of Trust of April 10, 1959, and Frances Evelyn Maddox, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 10164.**

United States Court of Appeals Tenth Circuit.

May 27, 1969.

Robert Templeton, of Kolander & Templeton, Amarillo, Tex., for appellants.

Frank B. Friedman, Atty., Dept. of Justice, Washington, D. C. (Clyde O. Martz, Asst. Atty. Gen., S. Billingsley Hill and B. Richard Taylor, Attys., Dept. of Justice, Washington, D. C., and John F. Quinn, Jr., U. S. Atty. and John A. Babington, Asst. U. S. Atty., Albuquerque, N. M., on the brief) for appellee.

Before BREITENSTEIN, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

The United States instituted proceedings to condemn 6,816.5 acres of a total of 33,150 acres owned by the appellant in Rio Arriba County, New Mexico. This land is part of approximately 10,-000 acres required for construction of the Heron Reservoir portion of the San Juan-Chama reclamation project in Colorado and New Mexico. The issue of just compensation was presented to a jury which fixed the market value of the appropriated land at $155,000. The figure was arrived at after the value of the land taken was reduced by an amount determined to be the value of special benefits accruing to the remaining land as a result of the implementation of the reservoir project. On this appeal the principal contention is that the enhancement in the value of the remainder of the tract was not a special and direct benefit and should not have been deducted from the compensation for the appropriated land or, in the alternative, if the increase in value was a special benefit it was too speculative to legitimately be taken into account.

The San Juan-Chama project was authorized for the chief purposes of furnishing water to tributary irrigation units in the Rio Grande Basin; supplying water for land in the Middle Rio Grande Conservancy District; and for meeting the needs of municipal, domestic and industrial uses in the City of Albuquerque, 43 U.S.C. § 615pp. The water for the project is to be diverted through a series of tunnels from a drainage area west of the Continental Divide, into the project reservoirs which will empty in the Rio Grande east of the Divide. Accordingly, the project is not aimed at flood control but rather it is a reclamation project whose reservoirs will be utilized primarily as receptacles for water committed for use elsewhere.

The land of the appellant, known as the El Poso Ranch, is a combination of several tracts used before the taking for ranching, agriculture and recreation. The appropriated tract lies in the northeastern portion of the ranch and is the basin or valley area from which the ranch derives its name. To the southwest of the valley is the southern tract of the ranch, the Cooper-Neal Tract, comprised of low lying sage, the least desirable portion of the ranch. North of the Cooper-Neal Tract is the Pound Ranch Tract, an area of hills and high mesas. To the east of the Pound Ranch Tract is the El Vado Reservoir, constructed in 1935 to impound water of the Chama River. The water released from the new Heron Reservoir will pass through El Vado into the Chama. Along the west side of the El Vado Reservoir there is a subdivision development promoted in the early 1960's. North of the Pound Ranch Tract is a 600-acre subirrigated valley, Pounds Meadow, which is the most fertile portion of the ranch and the area through which Highway 95 passes. The area north of the meadow is high mesa country which is contiguous with the area north of the take line. This latter area is a rocky plateau which houses the present ranch headquarters. The 6,816.-5 acres taken consists of four types of land: 1300 acres of crested wheat pasture; 2800 acres of valley land; 1654.5 acres of gravelled hills; and 1052 acres of mountain slopes. With the exception of the Pounds Meadow, this is the most productive portion of the ranch.

At the trial a Government hydrologist testified that on the basis of a study of the area for the years 1935–1957, he could estimate the nature of the reservoir by projecting from past conditions. He concluded that considering the purpose of the reservoir as a holding project for downstream water users, there could be anticipated an annual diversion of 110,000 acre feet into the reservoir with 101,800 acre feet to be drained therefrom, the difference being the projected annual evaporation loss. This would result in the level of the reservoir fluctuating some 83 feet between maximum and minimum fill, with the average fluctuation expected to be 32 feet. The hydrologist concluded by indicating that after the dam construction is finished in the spring of 1971, as many as ten years might elapse before the reservoir would reach its expected minimum fill level.

Although all of the various valuation experts relied to some extent upon the projection estimates of the Government hydrologist, there was a considerable divergence of opinion. The witness Mundy, testifying on behalf of the landowner, estimated the value of the property before the taking to be $1,675,000; the value after the taking to be $1,231,960; with the difference of $443,040, the amount of just compensation. The other expert for the landowner fixed the precondemnation value at $2,803,887; the value of the remainder at $2,168,060; the difference of $635,827 representing his estimate of net compensation owed the landowner. Darrow, the first expert to testify for the Government, estimated the value of the ranch prior to the taking at $885,000; the value after the taking at $765,000; with the $120,000 difference being his opinion as to proper compensation. He indicated that the remainder was benefitted because of its $7\frac{1}{2}$ mile frontage on the new reservoir, and that this benefit would be in the form of increased demand for the property for use as "cabin sites, recreational uses, subdivision." The amount of this special benefit to the remainder was said to be based upon "bulk sales of recreational land or recreational potential land and analyzed * * * along with the El Vado subdivision, to help arrive at some indication of what this enhancement factor would probably be * * *." There was also some indication that he considered the relocation of Highway 95 to be of benefit to the remainder although this statement was apparently qualified upon cross-examina-

tion. The other Government expert agreed that the value of the remainder was enhanced by its frontage on the new reservoir. He placed a value of $861,500 on the ranch before the taking with an after taking value of $721,500 resulting in a suggested compensation of $140,000. As we have indicated, the jury returned a verdict of $155,000; a figure between the high and low extremes of the respective witnesses.

■ It is rudimentary that when private property is taken for public use the owner must receive just compensation for his loss. The owner "is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270 (1897). Thus, when the sovereign appropriates part of a particular parcel of land, the owner's compensation includes not only the value of the land taken but also the diminution in value of the remaining part resulting therefrom. If the appropriation of a portion of a single tract has in fact benefitted the remainder, then the benefit may be set off against the value of the portion taken. United States v. Miller, 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336 (1943).

The benefits that arise in these situations have been characterized by the courts as "direct," "indirect," "general," and "special," with only "direct" and "special" being allowed as a set off.[1] Congress apparently approved this policy when it provided that "special and direct benefits" must be deducted from the compensation due the landowner. 33 U. S.C. § 595. These deductible special benefits are those which arise from the unique relationship of the land to the public improvement. Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897). Accordingly, the enhancement in value resulting from frontage on a wider and more desirable street[2] or the proximity to a body of water contemplated by a public project[3] is the type of benefit that has been recognized as direct and special.

■ In the instant case the Government attempted to show that special benefits to the remainder would result from its demand for use as cabin sites, recreational uses and the like. To this end the Government's valuation experts testified that the market value of the remainder was enhanced. Their conclusion was said to be based upon sales of land adjoining other reservoirs. There apparently were no comparable sales with regard to this particular reservoir. The expert, Darrow, testified that his evaluation was based upon the assumption that the adjoining owners would enjoy unlimited access to the reservoir. This is clearly an unwarranted assumption in this situation in which the United States condemned the fee interest. Having appropriated sufficient acreage to ensure that the water level will at all times be well within the bounds of Government land, the United States as the owner in fee will have the legal right to fence the reservoir or otherwise prevent access to the water. The landowners will have no greater rights than the general public. Thus, the right of access in

1. See Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897); United States v. River Rouge Imp. Co., 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339 (1926); United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); Aaronson v. United States, 65 App.D.C. 14, 79 F.2d 139 (1935); United States v. 2,477.79 Acres of Land, More or Less, Situate in Bell County Texas, 259 F. 2d 23 (5th Cir. 1958); United States v. Crance, 341 F.2d 161 (8th Cir. 1965); United States v. Alcorn, 80 F.2d 487 (9th Cir. 1936). See generally, Annot.,

145 A.L.R. 7 (1943); Annot., 19 L.Ed.2d 1361 (1967); and 3 Nichols, The Law of Eminent Domain § 8.6203 (3d ed. 1965).

2. Aaronson v. United States, 65 App.D.C. 14, 79 F.2d 139 (1935); Annot., 13 A.L.R.3d 1149 (1967).

3. United States v. 2,477.79 Acres of Land, More or Less, Situate in Bell County, Texas, 259 F.2d 23 (5th Cir. 1958); United States v. Trout, 386 F.2d 216 (5th Cir. 1967).

itself will not be a special benefit and the lack of access will affect the value of the special benefit arising by reason of the lakeside property's potential for homesite development. Clearly, the demand for lakefront property will be lessened when it is known that the principal advantage in such property may well be the scenic view it commands. The expert having relied upon an erroneous assumption as to the abutting owners right of access, his valuation will be set aside and the case remanded for new findings. United States v. Honolulu Plantation Co., 182 F.2d 172 (9th Cir. 1950).

■ Perhaps more significantly, however, we conclude that the testimony of both Government experts as to the value of special benefits is too speculative to be meaningful. In connection with the reservoir project, the United States allocated $400,000 to provide for the construction of recreational facilities consisting of picnic tables, sewage, water, electricity and a boat launching ramp. This concrete ramp, essential for launching boats in the reservoir, will be several miles from the appellant's land and will be the only one constructed since the Government has full title and has provided for no other. Thus, the only recreational facilities are to be located off appellant's land at a place where no roads of any kind directly connect those facilities and the El Poso Ranch. It also appears from the record that because of the nature of the rugged terrain, very little of appellant's land will be blessed with a view of the water. Moreover, it is undisputed that from the date of taking on July 21, 1965, until the completion of the dam in the spring of 1971, some six years will have elapsed before the reservoir can be flooded. From the time the flooding begins, it is possible that as many as ten years might elapse before the water reaches the level necessary to enjoy the Government recreational facilities. In view of these facts, it would seem difficult to conclude that the value of the lakeside land will be enhanced. The land will have a restricted view, no unique access to the water, no direct access to the recreational facilities, and a number of years to wait even for that.

Against the background of uncontradicted physical fact, the Government experts merely indicated in unexplained total dollar figures, their opinion as to value enhancement.[4] In such circumstances, their testimony is of little value. To have probative value expert opinion must be "founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation." United States v. Sowards, 370 F.2d 87, 92 (10th Cir. 1966). Here the Government experts relied on erroneous legal assumptions, made no attempt to specify the kind of benefit contemplated or to limit the amount of acreage felt to be benefitted. Surely the entire 26,000 remaining acres will not be useful for lakeshore development and will not be benefitted. Yet the Government experts did not explain their gross valuation or denominate the extent of the benefit in any way. Obviously such "speculative and remote possibilities cannot become a guide for the ascertainment of value in judicial ascertainment of the truth." Wilson v. United States, 350 F.2d 901, 909 (10th Cir.1965); United States v. 2,635.04 Acres of Land, 336 F.2d 646 (6th Cir. 1964).

Numerous other alleged errors have been raised by the appellant. However, in view of the fact that the case is to be remanded, it is necessary only to comment briefly on some of the issues raised.

4. The Government experts did not attempt to indicate the dollar value placed upon special benefits. They merely stated aggregate "before and after" values and indicated that the "after" value was reduced by a certain unidentified amount for special benefits. Such a lackadaisical presentation, not unlike that embodied in the appellate brief, hardly deserves commendation.

■ The landowner contends that he attempted to determine, through interrogatories and requests for admissions, whether there had been a change in taking that would allow the condemnee to recover increased value under the exception discussed in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). The Government does not attempt to justify a refusal to answer, but instead insists that it did respond to all questions raised. Although there does not appear to have been a change in taking, we need not belabor the point since in the event of a new trial, discovery procedures will become available for the landowner to satisfy all legitimate inquiry into the matter.[5]

■ During the course of the cross-examination of the Government expert, Darrow, the landowner attempted to evoke testimony that would explain the reasons for that expert having appraised other condemned property in the area at a higher per acre valuation than he did that of the landowner. The court ruled that it was an attempt at impeachment as to collateral matters and the landowner would have to "take the answer." There is some authority for allowing the cross-examination of the expert as to his appraisal of neighboring property,[6] but the opportunities for confusing the jury and needlessly lengthening the trial are such that the court is allowed wide latitude in controlling the extent of such inquiry. Grain Dealers Mutual Ins. Co. v. Farmers Union Coop., 377 F.2d 672, 680 (10th Cir.1967). It must be assumed that the court will use this discretion wisely during the course of any new trial.

■ The landowner also complains of the failure of the Government to allow discovery of the contents of the appraisal report of an expert originally retained by the Government to appraise the property. For reasons of its own, the Government determined not to call the expert as a witness and the landowner apparently concluded that this turn of events would add credibility to the expert's opinion. The landowner thus deposed the expert and during the course of the taking of the deposition sought to obtain the report that the expert had previously submitted to the Government. The landowner was not successful. This problem has been the subject of a proposed amendment to Rule 26(b), F.R. Civ.P.,[7] and an exhaustive opinion of the Ninth Circuit.[8] We conclude that the trial court did not abuse its discretion in limiting discovery to those portions of the report relied upon by the expert to refresh his recollection. The fact that the Government consulted the expert but did not use that opinion is irrelevant; the prior consultation could not be shown in an attempt to bolster the expert's credibility, "nor could * * * [the landowner] seek to arouse jury prejudices by showing the prior consultation under the guise of proving the [expert's] qualifications." Dicker v. United States, 122 U.S.App.D.C. 158, 352 F.2d 455, 457 (1965). If the landowner "wanted more expert testimony on value it was for * * * [him] to produce such evidence." 352 F.2d at 457.

■ Appellant further complains that the testimony of the Government's mineral valuation expert, John Anderson, was based on his opinion of a colleague's opinion of the area. We agree that "expert opinion may not be based upon the opinion of others, either in evidence or

5. The landowner also asserts that he should not be required to adhere to the procedures formulated in 43 C.F.R. §§ 2.5 and 2.6 with regard to obtaining discovery against the Government. No authority is cited for the proposition that the Federal Rules of Civil Procedure nullify these regulations and we conclude that appellant's claim is without merit.

6. See 5 Nichols, The Law of Eminent Domain § 18.45 [2] (Supp.1968, at 80–81).

7. See proposed Rule 26(b) (4), 43 F.R.D. 225 and comment thereon at 43 F.R.D. 233.

8. United States v. Meyer, 398 F.2d 66, 76 (9th Cir. 1968).

not in evidence." Taylor v. B. Heller and Co., 364 F.2d 608, 613 (6th Cir. 1966). We need not, however, examine the record in detail in order to determine if that is what occurred. It is enough to note that if upon retrial the same question arises, the trial court must take steps to exclude any expert opinion that is predicated upon another opinion.

■ Finally, the landowner argues that the jury was not properly instructed to limit its consideration of special benefits to those arising within a reasonable time after the filing of the declaration of taking—the date used to fix just compensation. A careful analysis of all of the instructions leads to the conclusion that the jury may indeed have been misled. In generally defining the term "fair market value," the court did indicate that the jury was to consider "the use for which the property is suitable or physically adaptable at the time or within the reasonably near future" and to consider only "reasonable probabilities as to future potential uses."

Yet in that portion of the instructions discussing special benefits, there was no mention of the time factor. The jury should have been instructed, at the time that special benefits were being defined, that such benefits are cognizable only if they affect the market value at the time the declaration of taking is filed. "Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration * * *." Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934).

All additional contentions of the parties being either frivolous or rendered moot by our disposition of the case, further discussion is unwarranted.

Reversed and remanded for further proceedings consistent with this opinion.