Chief Judge Fuld.
The principal question posed—an important one in the field of condemnation—is whether it is permissible to fix the market value of land, completely bare when condemned, solely on the basis of capitalization of income expected to be realized from buildings and other extensive improvements not yet financed, on which no work had even been begun on the day of taking.
The State on May 10,1961, appropriated slightly over 16 acres of vacant land—part of a larger 26.78-acre parcel—for hi > way purposes. The property fronted on a main highway in Rockland County and was well situated for development as a shopping center. The claimant fee owners (Siegel et al.) had completed their assemblage of the entire 26-acre parcel several months before the condemnation at a cost of $247,800 and had leased it to the claimant tenant (Banner Holding Corp., the assignor of Arlen of Nanuet) only four months before the taking for an annual rent, after the first year, of $61,250, for a 25-year term, with options in the tenant to renew or purchase. This ground lease expressly envisaged that the tenant would sublet the parcel to E. J. Korvette, Inc., a discount department store chain. Subleases were thereafter executed which obligated the tenant to erect, at its own expense, a large retail store building, a supermarket building, a patio shop and a parking area. Upon completion of this construction—an enterprise involving the investment of several million dollars by the ground tenant— the obligation of the subtenant, Korvette, was to become effec *352 tive. It was to pay an annual rent of $285,000 to its sublessor, the tenant Banner. Although these leases had all been entered into before the condemnation, not a shovel had been turned, no work whatsoever done, on the site. In a word, the plot consisted of vacant, raw land.
For the 16 acres taken by the State, the Court of Claims awarded $702,610 to the fee owners and $875,000 to the tenant (50 Mise 2d 934). A divided Appellate Division affirmed the award (of $702,610) to the fee owners but modified the tenant’s award by reducing it to $525,000 (31 A D 2d 221).[1] In determining the value of the land, the courts below adopted a capitalization of income method—that is, they capitalized the rent expected to be realized from the buildings to be constructed on the parcel-—-and this, as indicated above, gives rise to the question with which we are primarily concerned.
The question is not a new one. (See Levin v. State of New York, 13 N Y 2d 87; see, also, Salzberg v. State of New York, 24 A D 2d 664, 665, affd. 18 N Y 2d 965; Levitin v. State of New York, 12 A D 2d 6, mot. for rearg. den. 13 A D 2d 611.) Indeed, in Levin v. State of New York (13 N Y 2d 87, supra), we dealt with the problem -of valuing vacant land which, on the day of taking, had been leased to financially responsible people for development. In the Levin case, the State argued that the Court of Claims had fallen into the error of basing its valuation of the vacant land there involved on a capitalization of income from the land as if it had been improved by buildings which were not constructed at the time title vested in the State. We agreed with the State’s position that such a method was impermissible but decided that the record did not support such a hypothesis. More specifically, although we held that executory leases and agreements — relating to land vacant on the day of the taking— may be given some weight as enhancing the value of the vacant parcels, we pointedly declared that it would be error to expand the weight of such evidence by treating those leases and contracts as if they represented an income flow already in being.
*353 Addressing itself to the State’s claim of error, we wrote that the trial court “ did not fall into [that] error of valuing the property by capitalizing the net rental income as might have been proper if the building had been completed and rent had commenced” (13 N Y 2d, at p. 91).[2] As I have already indicated, to give the anticipated rentals an annuity-like significance, as the courts below have done, is a distortion of the realities of the situation, of the condition of the property still vacant and unimproved. As we observed in the Levin case, one cannot “ expect the prospective purchaser to pay for the vacant land in suit an amount equal to the worth of the conjectured net rental income * * * for, then, he would be paying an amount which would preclude any profit ” (13 N Y 2d, at p. 91). We might have added, what is implicit in the opinion, that, if one paid before construction an amount equal to the value of the conjectured net income, he would not only have been precluding any possibility of profit but, indeed, might be letting himself in for a loss if the conjectured net income did not later materialize. Moreover, we went on to say, an experienced prospective purchaser, in determining the price he would be willing to pay, would be most directly concerned with ‘ ‘ what other properties were selling for ” and with what other “ competitive alternatives ”— fees or leaseholds — “ were available ” to him (13 N Y 2d, at p. 91).
These settled principles and guidelines, the indicia of value most frequently relied upon by businessmen as well as courts, are not to be deemed irrelevant merely because the vacant land appropriated was leased to a developer. However, both the Court of Claims and the Appellate Division were of the opinion that they could properly disregard such settled principles and the accepted indicia of value and, instead, rely on a capitalization *354 of rents from structures not yet begun to be built because they believed that there were special circumstances present.
With this in mind, let us consider the circumstances. In April of 1961, about a month before the taking, it was still not clear whether the projected highway improvement would go through the subject property or around it. Undoubtedly to guard against the eventuality of condemnation, the tenant on April 13, 1961, obtained a ground lease of an adjacent 26-acre parcel—for the lower annual rental of $52,500—and, after the taking of the subject property, transferred its Korvette subleases to that adjoining parcel. It was on this new site that a shopping center was subsequently erected; somewhat larger than the one planned for the subject property, it was completed and in operation long after the taking but before the trial.
The conclusion of the courts below—that the rental income actually being earned by these buildings was not presumed or hypothetical and was, therefore, properly used as the basis for income capitalization of the sublease rentals of the subject property—was egregious error. So, too, was the treatment accorded the ground lease, for the courts below not only capitalized the rentals for its first 10 years but proceeded to treat all the other terms of that lease as self-executing. For example, the courts assumed that the ground tenant would exercise an option in the lease to purchase the land at the end of 10 years and, having made that assumption, they then simply added the present worth of the supposed purchase price to the present value of a 10-year flow of rent in order to determine the award to be made to the fee owner.
Such a use of the experience of the project on the adjacent site, a project on which construction had not been commenced on the day of the taking, was in violation of the principle that, to determine the market value of land appropriated, we must look to the situation existing on the day of the taking. It matters not that, in the case before us, the project had in fact been developed on adjacent property prior to the trial. The significant fact is that it was not begun until after the appropriation. To sanction the capitalization of income method adopted below would be to overturn the long-established and wise rule, reflected in our Levin decision (13 N Y 2d 87, supra). It would be a serious departure from principle, and most unsound, to announce that *355 fair compensation is to be determined not as of the day of taking but, instead, as of the time of trial, whenever that might happen to be.
Additional error was committed by the rejection below of the settled procedure followed in valuing real property in which a tenant may have a leasehold interest that survives the taking. Such procedure is, first, to value the unencumbered fee—thereby determining the value of all the interests taken[3] — and, then, to determine the value of the tenant’s interest, if any—such value being dependent upon whether the rental value of the land is greater or less than the rent reserved in the ground lease. If there is an excess rental value, the worth of that excess is the amount to be awarded to the tenant. That amount is carved out of the amount of the total award—the value of all the interests in the land taken — and the balance is the sum to be awarded to the owner of the fee. (See, e.g., Great Atlantic & Pacific Tea Co. v. State of New York, 22 N Y 2d 75, 84; Matter of City of New York [Allen St.], 256 N. Y. 236.)
Instead of determining the tenant’s interest in the manner just indicated, the courts below valued it by capitalizing—after deducting an estimated return on the buildings and the ground rental — the rent of $285,000 to be paid by the subtenant. This was error not only because the land was still vacant and raw on the day of taking but because the value of the subleases to Korvette was already reflected in the size of the ground rent of $61,250 which had been arrived at in express contemplation of the subleases to Korvette and the eventual construction of the buildings and other improvements by the ground tenant. To state the matter somewhat differently, the sublease rental of $285,000 (payable by Korvette) was to be the reward to the tenant for investing several million dollars in construction costs and for gambling on the eventual success of the shopping center. The land was simply one component of the enterprise.
No shopping center was appropriated by the State. The vacant lot which it took was not a shopping center and, certainly, the agreements among financially responsible people about what *356 they planned to do in the future with that lot did not transform it into one. The ground lease rental was one reflection of the value of the land; the sublease rental was only remotely such a reflection. This is not to say that it was improper for the trial court to receive the subleases in evidence as bearing on the issue of highest and best use but it was grave error to give them the weight which was accorded them.
Upon the retrial, the value of the entire land — that is, the value of all the interests in the land — should be determined by reference to the sales prices and ground rentals paid for neighboring or competitive lands. This would include the ground rent of $52,500 which the tenant contracted to pay for the adjacent property to which the Korvette subleases were transferred. (See Levin v. State of New York, 13 N Y 2d 87, 91-92, supra; see, also, 31 A D 2d, at pp. 229-230, per Reynolds, J., dissenting.) Capitalization of the $61,250 ground rental may be properly used as one of the indicia of value of the vacant land, since, as already noted, such ground rent reflected the opinion of experienced businessmen as to the value of this vacant land for shopping center use. As for the capitalization rate to be employed, we agree with the view expressed by Judge Reynolds, in dissent, that the rate must be not only one with support in the evidence but one which indicates that the rental income to be derived from this ground lease was, on the day of taking, “ subject to more than the usual risks ” (31 A D 2d, at p. 231).
In valuing the tenant’s leasehold interest, the inquiry upon the new trial is to be confined to ascertaining whether the rental value of the vacant land was greater or less than the ground rental of $61,250 a year. The leasehold interest is not to be valued according to the method, adopted by the courts below, of valuing that interest on the basis of what the tenant hoped to earn from its speculative investment of millions of dollars in buildings not yet built and a business not yet in operation. On this issue of rental value, the State points to the fact that the tenant succeeded in obtaining, about a month before the taking, the long-term lease of adjacent property to which we have referred. That rent was $52,500 a year for property virtually a twin, in size and location, of the subject land. Manifestly, this goes far toward demonstrating that the claimant tenant had no leasehold interest at all, since such rental would indicate that *357 the rental value — the market value of the leasehold—was less than the $61,250 ground rent stipulated in the lease. This being so, there is much to be said for the view expressed by the dissenting Appellate Division justices that the tenant’s claim be dismissed. However, since the trial court found, in another context, that this adjacent parcel may not have been “ as attractive and favorable ” as the subject property, it is our conclusion that the tenant should be privileged to prove, if it can, that competitive land for shopping center use commanded, at the time of the taking, a higher rental than at the rate of $61,250 for 26 acres.
We also agree with the dissenters below that the claimant tenant, by moving its shopping center project to the vacant neighboring parcel, retained all of its potential profits under the Korvette subleases and that, consequently, the award gives the claimant a windfall by allowing it compensation for the fictional loss of such benefits. As Presiding Justice Heblihy put it, “ ‘ [j]ust compensation ’ requires a holding that Arlen is not entitled to receive the full financial benefits from its sublease and also receive compensation for the fictional loss of such benefits ” (31 A D 2d, at p. 228).
In sum, the erroneous methods of valuation to which we have called attention require a complete retrial of the claim of the fee owners’ as well as that of the tenant and, accordingly, the orders appealed from should be reversed, with costs, and a new trial ordered.

. Even after the amount had been reduced by the Appellate Division to $1,227,610, the award, per acre, for the 16 acres ‘involved is nine times more than the purchase price, per acre, paid by the owners for the entire 26-acre parcel but a few months before the taking.

. We call attention to the dissenting opinion (in Levin) at the Appellate Division, written by then Presiding Justice Bergan, which states the matter well (17 A D 2d, at p. 339) : “But there were no improvements on this land when the State appropriated it. To treat a plan to put up a building as a building that has been put up; and then to capitalize the rent reserved in the lease as though the building had been put up and occupied and the lease had successfully run its full course to the end, seems an unrealistic approach to a proper award in condemnation.”

. In the case before us, there was a partial taking, 16 acres of a 26-acre tract. The value of the 10 acres of land retained by the owners after the taking would, of course, have to be deducted from the value of the entire tract to determine the amount of the total award.