Harry Waxman, Respondent-Appellant, v State of New York, Appellant-Respondent. (Claim Nos. 50730 and 50731.)

Third Department, May 12, 1977

*Louis J. Lefkowitz, Attorney-General (Joseph F. Gibbons* and *Ruth Kessler Toch* of counsel), for appellant-respondent.

*Axenfeld, Webb, Marshall & Scolaro (Charles S. Webb* of counsel), for respondent-appellant.

MAHONEY, J. At the time of the taking, March 2, 1967, the claimant owned a 323-acre tract of land in Westchester County. He had purchased the land piecemeal between 1963 and 1966 at a total cost of $280,000. The bulk of the tract had originally been a grand estate, including on its eastern portion a large brick residence, attendant garages and greenhouses, a lesser house, and a lake. Other than the area immediately about these structures, the land was heavily wooded.

Claimant's purpose in acquiring the land was to build a golf course, using the estate buildings as clubhouse and maintenance facilities. He also anticipated selling for residential development parcels along Buxton and Bedford Center Roads. These roads formed the western and southwestern boundaries of the tract. Under claimant's original plan, these residential parcels would directly abut the golf course. A permit to build the course was obtained from the Town of Bedford in 1965 on

the basis of claimant's application which included a layout for the course prepared by his architect, Albert Zikorus.

Preliminary work, consisting mostly of laying out and clearing fairways, began in June of 1966, the work being done in keeping with the original plans, i.e., upon the assumption that the highway would not interfere with the projected layout. Some $58,000 was spent before work stopped in November, 1966 upon receipt by claimant of the tentative appropriation map. This map, which was identical to the final version, showed that the State would take a 58-acre strip for its highway, to run north and south, bisecting the tract into a 94-acre western and 171-acre eastern portion. These figures include the Fuller property.[1]

I. HIGHEST AND BEST USE.

Although the appraisers for both parties agreed that the highest and best use before and after the taking was for residential development as to the western portion and golf course development as to the eastern, they disagreed about the relative extent of each portion. With respect to the before-taking situation, claimant's appraiser deemed 82 acres to be residential, with 241 acres in the golf course portion. The State's appraiser thought the residential portion encompassed 123 acres and that only 183 acres should be allocated for the golf course. The State's figures do not total 323 acres because the 17-acre Fuller property was not included. This error severely impeached the State's apportionment and justified the trial court's rejection of the State's appraisal since the validity of the appraisal is dependent upon the reasonableness of the apportionment (see *Ridgeway Assoc. v State of New York,* 32 AD2d 851). Unless the size of the residential portion is correctly determined, it would not be possible to fairly calculate the development costs. Such costs would in large part depend on the expense of meeting the zoning restrictions, which permitted lots of a minimum of four acres with at least 250 feet of frontage. The ease of meeting these restrictions would depend on the shape and size of the plot devoted to residential use. Aside from the failure to consider the Fuller property, the State's before-taking apportionment is

---

1. In 1965 the State notified claimant of the possible route for a four-lane highway, I-502, indicating that a strip might be taken through the tract. In order to be sure enough land would be left to the east of the highway to build 18 holes, claimant acquired in January, 1966 the Fuller property, adding 17 acres to the northeastern side of the tract.

further called in question since the boundary chosen to separate golf course from residences coincided with a portion of the right of way line on the appropriation map. This line, although a sensible dividing measure after the taking, is entirely arbitrary insofar as the before-taking highest and best use.

The claimant's expert used a more reasonable guideline, to wit: the original golf course layout approved by the town in 1965. This plan apportioned only 82 acres for residential development, presumably because the limited road frontage would be adequate for no more than about 20 four-acre lots. Therefore, the claimant's apportionment of the residential and golf course uses was properly adopted by the trial court.

## II. VALUE OF RESIDENTIAL PORTION.

Because an essential assumption (i.e., the apportionment of the highest and best use) of the State's appraisal was, perforce, rejected, no range of testimony existed and the trial court was constrained either to accept the claimant's before and after values or explain any departure (*Matter of City of New York [A & W Realty Corp.]*, 1 NY2d 428; *Foothills Corp. v State of New York*, 50 AD2d 986; *Weiner v State of New York*, 48 AD2d 440).

The amount of land apportioned to residential use was increased by the taking since the highway strip passed mostly through the 271 acres set aside for the course. After the taking, all the 94 acres west of the highway had to be deemed residential, with the 171 acres east of the highway left for the course (94 + 171 + 58 taken for road = 323). Claimant, using comparable sales, found a before-taking residential land value of about $3,700 per acre and made various adjustments to that figure to arrive at his final before-taking value, $5,610 per acre. The only adjustments now in dispute are those for subdivision costs and enhancement due to abutting upon a golf course.

The State contends that the 5% reduction by claimant's appraiser of the comparable sales was inadequate since the cost of developing the 82 acres would have been considerably greater than 5%. Claimant's appraiser assumed that, given the minimum four-acre lot zoning restriction, 20 lots could have been carved out of the 82 acres. However, he admitted on cross-examination and indicated in his written report that the 82 acres fronted on only 4,000 feet of road. As the Court of Claims noted—"[Claimant's appraiser] contends that this

parcel can be divided into 20 building lots with a before value of $5,610 per acre * * *. There is approximately 4,000 feet of frontage and to consider 20 building lots of 4 acres each with road frontage, each lot would have to be in the neighborhood of 200 feet wide and about 890 feet in depth. Claimant's appraiser values such a lot at $22,440. The Court does not believe a prospective buyer would be willing to pay this amount for a lot having only 200 feet frontage. It appears the appraiser used this approach to value in order to eliminate the costs of interior roads. This adjustment of a minus 5% would in no way cover subdivision planning and road construction." Apparently because of this flaw and the fact that claimant's appraiser did not adjust his comparable sales (which were tracts generally smaller than the 82-acre parcel in question) for difference in size,[2] the court found a before value of $5,000 per acre. However, no explanation of how the court arrived at the $600 per acre reduction appears. Although the failure to explain this departure ordinarily might require reversal of the award and a new trial, there is sufficient information in the record for this court to make a reasonably accurate modification.

The State does not challenge the suitability of the comparable sales used by claimant's appraiser to arrive at his unadjusted before-taking value of $3,700 per acre. Accepting this figure, it becomes necessary only to determine what adjustments are warranted. As to whether the 5% negative adjustment[3] for development costs was adequate, the State raises several compelling arguments on appeal indicating that the costs would have been somewhat greater. However, at trial the State made no effort to specify how much greater, leaving the Court of Claims and this court in no position to make a precise adjustment. Since the potential error on this point seems *de minimis,* the mere 5% reduction is accepted.

The largest adjustment by claimant's appraiser of the comparable sales was for the enhancing effect the 82 residential acres would have enjoyed in abutting the golf course. This was a major factor in increasing the award, since after construc-

2. The court thought, perhaps correctly, that as to tracts equivalent in quality but different in size, the smaller tract will sell for more per acre. However, there is no evidence, either in the form of expert opinion or comparable sales, which supports this view.

3. A negative adjustment is one which reduces the base figure. In this instance the appraiser adjusted the $3,700 per acre base figure by multiplying by .95.

tion of the highway all the residential land was separated from the course. The enhancement was reflected in claimant's written appraisal at page 16. Each of the per acre values of the comparable sales was multiplied by a factor of about 1.6. This factor is labeled merely "location adjustment", but at page 21 of the appraisal it is explained that a 50% upward adjustment was made for enhancement due to the golf course. The 10% further upward adjustment was for other location factors, making the location adjustment total 1.6 (i.e., 60%). The appraisal adequately justifies the magnitude of the enhancement factor by comparing sales of similar land, some abutting golf courses and some not. The appraiser explained that the land abutting a course was especially valuable because of the privacy, beauty, prestige, and the convenience to the course (which the residential owner would presumably join as a member). The State does not dispute this, but points out that no golf course had been built at the time of the taking (March 2, 1976), so such enhancing factors should not be considered.

It is not necessary for a project to physically exist in order to have an enhancing effect. The reasonable expectation of the benefits, like the expectation of obtaining a zoning change, would affect the market value. This is clearly so here, since claimant Waxman, who owned the entire tract, could have covenanted with purchasers that he would construct the course. Such a covenant would indisputably enhance the value of the residential parcels.

Nevertheless, this enhancement should not be considered. The claimant himself would have had to invest the money to build the course, so that the enhancement would be at his own expense. Even though the enhancing effect is necessarily incidental to construction of the course, it would not truly reflect the before value of the tract to consider as completed an enhancement which the tract owner would enjoy only upon expending over one-half million dollars and which might not prove to be economically successful in itself (cf. *Arlen of Nanuet v State of New York,* 26 NY2d 346, 356). The 82 acres should be valued before the taking without an added increment for golf course enhancement. By eliminating the 50% enhancement from the location adjustment, the $3,700 base figure would be adjusted upward a net of 5% (i.e., reduced 5% for development costs and increased 10% for location factors

other than golf course enhancement), yielding an adjusted before-taking value of $3,885 per acre.

As for the residential land after the taking, the trial court found a value of $2,600 per acre. The proof of both parties was poor on this point. But rather than discuss the deficiencies[4] in each appraisal, we note that the parties in their briefs accept the $2,600 per acre found by the Court of Claims. This amount seems a fair approximation and is adopted.

### III. VALUE OF THE GOLF COURSE PORTION.

In finding a before value the court substantially adopted the appraisal of claimant's expert, who used sales of comparable raw land to arrive at a value of $2,486 per acre for the 241 acres and then added $58,063 for a total of $658,063[5] ($58,063 + [$2,486 per acre × 241 acres]). The $58,063 increment is the total expended by claimant on the golf land pursuant to the original plan approved by the town. The expenditures, itemized in claimant's Exhibit 13, were mostly for architectural plans, i.e., laying out the course ($8,500) and clearing the fairways of trees and rocks ($37,035). A total of about 80 acres had to be cleared for fairway for the original course, approximately 90% of which clearing had been completed when the taking occurred. The Court of Claims found the before-taking value to be $2,400 per acre plus the full $58,063 cost adjustment advocated by claimant. We affirm these findings except for the $58,063 increment.

The State argues that not all of the before-taking improvements were lost, since they for the most part were carried out in the untaken golf land eventually built into a course by claimant. Claimant responds that the taking caused a complete change in layout, preventing use of the cleared space. The evidence does not support the court's implicit finding that all of the pre-taking improvements were lost. Although claimant's architect Zikorus states in a letter that the before-taking costs "had no contributing value to the course construction

---

4. The most serious deficiency is in claimant's appraisal. The appraiser, in valuing the residential land after the taking at $1,800 per acre, used the same four comparable sales he used for the before and after values of the golf course land. Five entirely different comparable sales were used by him to reach a before value of the residential land. Apparently, none of the four comparable sales were near expressways. The appraiser used his own unexplained adjustments to quantify the amount by which this expressway would deflate the value of the land.

5. The appraiser approximated the product of $2,486 per acre × 241 acres as $600,000 and then added on the exact amount of $58,063. Thus, the $63 figure is not significant and gives a false suggestion of accuracy.

after the State's appropriation", in his oral testimony he said that 50% of the original clearing was used in the course as built. That the previous clearing was useful in building the amended design is further established by claimant's Exhibit 15, a map prepared to show the difference between the original and amended layouts. The amended plan is superimposed on the original. The exhibit shows that holes 1 and 10 are nearly unchanged and that substantial portions of the other clear areas under the original plan are clear under the amended one also.

Aside from the factual question of how much of the pre-taking expenditures were salvageable, the Court of Claims erred in mechanically adding what it found to be the lost expenditures onto the value of the raw land. Although reasonable expenditures in furtherance of the land's highest and best use are a proper factor to consider in determining market value (*Specialty Foods Corp. v State of New York,* 46 AD2d 989 [cost of development plans]; *Salomone & Co. v State of New York,* 40 AD2d 916 [architectural plans for plant construction]; *Rustcon Developers v State of New York,* 33 AD2d 582; *Matter of New York & Brooklyn Bridge,* 18 App Div 8 [foundation under construction]; cf. *Banner Milling Co. v State of New York,* 240 NY 533, 543, cert den 269 US 582), it was error to simply add such expenditures onto the value of the raw land (*Specialty Foods Corp. v State of New York, supra; Salomone & Co. v State of New York, supra; Rustcon Developers v State of New York, supra.* Cf. *Banner Milling Co., supra,* p 543). However, it seems overly technical to remand this complex case, filled with approximation, to determine the exact amount by which the unsalvageable improvements enhanced the before-taking market value. From all that appears, the improvements were sensible, well conceived reasonable in cost, and in furtherance of the only feasible use.[6]

Of the $58,000 in before-taking expenditures listed by claimant, the amounts for surveys ($968), legal fees and title insurance ($3,435) should be entirely disallowed. Claimant's proof does not precisely explain the nature of these expenditures, so it is not possible to tell if they were merely costs incurred in acquiring the tract or expended in building the original golf course. However, the State in its brief concedes

---

6. Zoning permitted only large lot residential or golf course development. The absence of access roads made residential development problematical, and the large mansion buildings could not be used to the fullest except in a golf course setting.

that 50% of the full $58,000 was unsalvageable. We find, therefore, that the before-taking market value was enhanced by $29,000.

In addition to the pre-taking costs, claimant seeks $205,000 in increased post-taking construction costs. He theorizes that it cost more to cut a course out of land partially prepared for an abandoned layout than to work on an untouched tract. Moreover, he contends that certain work completed before the taking was more expensive to carry out afterwards. Claimant's appraiser found an after value of the golf course land of $2,000 per acre, using the same comparable sales as he did to determine the before value. The after value is some $500 per acre lower than his before value because he adjusted the after value downward to reflect the presence of the highway.[7] To compute the total consequential damage to the golf land, the appraiser multiplied $500 per acre by the 241 remaining golf acres, and then added the $205,000. The trial court found consequential damages to the golf land of $400 per acre but disallowed any award for increased development costs on the ground that claimant had failed to prove that the taking had in fact increased costs.

As to the $205,000 increment, claimant's method of proof was to compare the actual cost of building the amended course ($538,150) with his architect's estimate of how much it would have cost to build the course as originally planned ($332,500). The court found most of the increases to be "exorbitant", and took particular note of the $55,000 of extra cost for tree planting, since no money was in fact spent for planting trees. The trees were to fill in the places cleared for the original plan which were not used as clear areas in the course as built.

---

7. The State argues that the presence of the highway caused no consequential damage to the golf course land. There is no doubt that impairment of aesthetic assets may be considered on the question of consequential damages *(City of Yonkers v State of New York,* 40 NY2d 408; *Purchase Hills Realty Assoc. v State of New York,* 35 AD2d 78, affd 30 NY2d 615), but it is always open to dispute whether an impairment of such an asset has in fact any effect on market value.

As in the case of the supposed consequential damage to the residential land, claimant's appraiser failed to explain how he arrived at the magnitude of his consequential damage adjustment to the golf course land. However, the problems of finding objective proof (e.g., comparable sales) concerning the amount by which an abutting expressway deflates the value of a golf course, seem almost uniquely difficult. Since it is manifest that the sight, sound and smell of speeding vehicles interferes with the emjoyment of golf, we will affirm the Court of Claims finding, based as it was on the opinion of claimant's expert, that the golf course land was consequentially damaged by $400 per acre. (See *City of Yonkers v State of New York, supra,* p 411.)

Assuming that claimant adequately proved that the taking increased the costs to develop the remaining land, such costs would be admissible on the issue of consequential damages *(Ridgeway Assoc. v State of New York, II,* 40 AD2d 1051, affd 34 NY2d 678; 4A Nichols, Eminent Domain [3d ed], § 14.247). However, as in the case of pre-taking costs, increased costs are only indirect proof of market value *(Ridgeway Assoc. v State of New York, II, supra).* They are only relevant to the extent they indicate how much less a reasonable purchaser would have been willing to pay for the land.

In this case the correlation between increased development costs and diminution of market value is particularly complex. For example, the $55,000 projected cost to plant trees deflates the after-taking market value only if it can be shown the trees would be necessary to obtain a course as economically valuable as the one originally planned. Arguably, a course with open areas adjoining the fairways would be more economically (as opposed to aesthetically) valuable since play might be faster on a more open course. This possibility may be somewhat supported by the fact that claimant did not choose to make the $55,000 investment for trees. The correlation is further complicated by claimant's assertion that air pollution regulations made effective between the initial and amended clearing added $30,000 to the cost of the course since they required stumps to be buried rather than burned. There is no proof in the record of whether the new regulations were effective on the date of the taking or that a reasonably prudent purchaser would have been aware of the implication upon the cost of building the course.

It is not believable that increased construction costs caused by the taking deflated the market value by $205,000. A mere $58,000 in tree clearing and architect's fees had been expended before the taking. Half of these expenses were salvageable. This is not a case where a taking displaced partially-completed hard and fast structures (see *Matter of New York & Brooklyn Bridge,* 18 App Div 8, *supra).* The only increased cost which convincingly would have deflated the market value of the inchoate golf course was the $7,000 for revised plans and specifications that was incurred solely because the taking forced a modification of the original plan. Although, as in the case of the before-taking expenditures, this $7,000 increased cost should not be mechanically subtracted from the after-taking market value, the absence of proof requires either a

remand or an estimate made on the present record. Since new plans unquestionably had to be made as a result of the taking and a prospective purchaser would certainly have anticipated such planning cost, we find that the claimant should be awarded the full $7,000.

The calculations comprising the modified judgment are as follows:

### BEFORE VALUE

| | | |
|---|---|---|
| Golf Course Land | | |
| 241.329 acres at $2,400 per acre | | $579,189 |
| Residential Land | | |
| 82 acres at $3,885 per acre | | 318,570 |
| Golf Course Improvements | | 29,000 |
| | Total | $926,759 |

### AFTER VALUE

| | | |
|---|---|---|
| Golf Course Land | | |
| 171.048 acres at $2,000 per acre | | $342,096 |
| Residential Land | | |
| 94.1 acres at $2,600 per acre | | 244,660 |
| Less Increased Construction Costs | | − 7,000 |
| | Total | $579,756 |
| Damages | | $926,759 |
| Before, less after | | −579,756 |
| | Total | $347,003 |

Finally, the propriety of the order of the Court of Claims, suspending interest, entered April 17, 1972, is presented.

The claims were filed on March 5, 1969, with the appraisals due to be filed six months thereafter, September 5, 1969 (Court of Claims Rule 25a, now recodified as 22 NYCRR 1200.27). The State's appraisal was filed on time, but over the course of several years the claimant was granted 13 extensions to file his report, the last having been granted on January 4, 1972 and which would have allowed until April 3, 1972 to file. None of these extensions was opposed by the State, but on March 21, 1972 it moved for an order suspending interest from September 5, 1970[8] until the time the claimant's

---

8. September 5, 1970 was apparently an arbitrary date chosen by the Assistant Attorney-General who made the March 21 motion.

appraisal is filed. By order dated April 17, 1972 the motion was granted.

The April 17 order in effect vitiated the prior 13 unconditioned extensions of time and was thus beyond the power of the court since the earlier extensions were the law of the case (cf. *Burgundy Basin Inn v Watkins Glen Grand Prix Corp.,* 51 AD2d 140; *Abazoglou v Tsakalotos,* 36 AD2d 516. See generally, 1 Carmody-Wait 2d, NY Prac, § 2:64. pp 76-78; 5 Weinstein-Korn-Miller, NY Civ Prac, par 5011.09). However, it was within the discretion of the court to suspend the interest past April 3, 1972, the date the last extension lapsed (22 NYCRR 1200.27 [d] [1]). The order is modified to suspend interest from April 3, 1972 until the date the appraisal was filed.

The order should be modified, on the law and the facts, to the extent of suspending interest from April 3, 1972 to the date of the filing of claimant's appraisal, and, as so modified, affirmed, without costs.

The judgment should be modified, on the law and the facts, by reducing the award to claimant to $347,003, plus interest, and, as so modified, affirmed, without costs.

HERLIHY, J. (dissenting in part and concurring in part). Considering the record as a whole and giving considerable latitude to the fact that the Judge in the Court of Claims viewed the property, I would affirm the judgment subject to one modification.

There is, *inter alia,* a firm basis for the court's determination of the before value of the residential property at $5,000 per acre; in fact the court reduced the claimant's value of $5,600. No one disputes the after value. There being such a basis, the court should not by some mathematical calculation arrive at a "reasonable accurate modification". There is ample justification in the record that the increment found by the Court of Claims should be added for golf course enhancement. The award being within the range of the testimony, it should be affirmed. *(Levin v State of New York,* 13 NY2d 87, 92, 93.)

The State contends that the court should have given it as "credit" an after value of at least 50% of the $58,063. There is some basis as pointed out in the majority opinion for a finding in this court that after value would include at least 50% of the before value of the enhancement or about $29,000. The so-called "enhancement" is in this case to an extent an improvement to the realty.

The judgment should be modified by deleting from the amount of the judgment the sum of $29,000, and, as so modified, affirmed, with interest as determined pursuant to the majority opinion.

GREENBLOTT, J. P., KANE and MAIN, JJ., concur with MAHONEY, J.; HERLIHY, J., concurs in part and dissents in part in a separate opinion.

Order modified, on the law and the facts, to the extent of suspending interest from April 3, 1972 to the date of the filing of claimant's appraisal, and, as so modified, affirmed, without costs.

Judgment modified, on the law and the facts, by reducing the award to claimant to $347,003, plus interest, and, as so modified, affirmed, without costs.