OPINION OF THE COURT
Frank S. Rossetti, J.
This claim is for damages arising from the temporary de facto appropriation of claimant’s interest in property located in midtown Manhattan in New York City. The taking was effectuated by an unconstitutional statute which unreasonably interfered with claimant’s use of the property by temporarily preventing the claimant lessee from demolishing a building thereon. Damages found in two prior trials were determined to be legally improper by the Court of Appeals and the case was remitted to this court on the issue of damages. (Keystone Assoc, v State of New York, 45 NY2d 894.)
This matter has been the subject of extensive litigation and detailed expositions of the facts underlying this claim can be found in various decisions. (See Matter of Keystone Assoc, v Moerdler, NYLJ, Sept. 19,1966, p 15, col 3, affd 26 *170 AD2d 918, affd 19 NY2d 78; Keystone Assoc, v State of New York, 63 Misc 2d 455, revd 39 AD2d 176, affd 33 NY2d 848; Keystone Assoc, v State of New York, 82 Misc 2d 620, revd 55 AD2d 85, revd 45 NY2d 894, supra.) Briefly, in 1961 the Metropolitan Opera Association, as part of its move to Lincoln Center and in order to provide future financing, entered into a 50-year lease covering the property occupied by its then existing opera house (the Old Met). Under the lease the Old Met was to be demolished and a modern highrise office and showroom building was to be constructed in its place. By May, 1966 development had reached the point where demolition was about to begin, but on May 16,1966 a statute was passed to save the Old Met. This law (L 1966, ch 691) set up a membership corporation to acquire the Old Met by purchase or condemnation and, in order to allow time to raise funds for this purpose, it authorized the New York City Superintendent of Buildings to refuse to issue a demolition permit for the building. Claimant, as assignee of the lease, made application for such a permit and it was denied the same day. Thereafter, the said statute was declared unconstitutional (Matter of Keystone Assoc, v Moerdler, supra) and claimant was issued the demolition permit on January 17, 1967, approximately eight months after the initial denial on May 16, 1966. Claimant then commenced demolition and subsequently constructed a 42-story office and showroom building on the property.
The temporary appropriation here was the said eight-month period claimant was delayed in developing the property. The Court of Appeals has determined that claimant’s measure of damages is the fair rental value of the property for the said period as of the time thereof. (Keystone Assoc, v State of New York, 45 NY2d 894, supra; concurring in part and dissenting in part opn of Greenblott, J., 55 AD2d 85, 90, supra.) This value is to be ascertained on the basis of what a willing lessee would pay for the eight months carved out of claimant’s leasehold by the taking and what a willing lessor would accept therefor. (See Keystone Assoc, v State of New York, 45 NY2d 894, supra; concurring in part and dissenting in part opn of Greenblott, J., 55 AD2d 85, 90, supra.) The Court of Appeals further found that the property was intended to be *171 developed and that the development had reached the point where future projections of income could be considered in determining said economic rental value. (See Keystone Assoc, v State of New York, 45 NY2d 894, supra; concurring in part and dissenting in part opn of Greenblott, J., 55 AD2d 85, 90, supra; see, also, Levin v State of New York, 13 NY2d 87; cf. Arlen of Nanuet v State of New York, 26 NY2d 346.) Of course, such projections are to be considered only as an element in said determination, with the trier of fact deciding the weight to be given them. (See Keystone Assoc, v State of New York, 45 NY2d 894, supra.) Also, while the ascertainment of rental value should include due consideration of the stage of development of the property at the time of the taking, the property should not be evaluated as if there were a completed building on it. (See Keystone Assoc, v State of New York, supra; Levin v State of New York, supra; Arlen of Nanuet v State of New York, supra.)
There is no question the highest and best use of the property at the time of the taking was for the construction of a high-rise office and showroom building. The difficulty in this case arises from the widely divergent final values found by the parties and the different methods used by them in arriving at these values. The State’s appraiser found a rental value of $340,000, based on the rental value of the vacant land plus an increment for the development that had been achieved at the time of the taking. Claimant’s appraiser found a rental value of $1,600,000, based on the net rental income that would have been realized upon completion of the building had there been no taking, said income being discounted to its market value at the time of the taking. Despite their differences, we find both methods proper ones to consider in ascertaining the requisite rental value, that is, we do not find the methods per se wrong as a matter of law. Nonetheless, we do find that significant factual errors are present in each appraiser’s implementation of his respective method and these errors largely explain the excessiveness of claimant’s ultimate conclusion of rental value on one hand and the inadequacy of defendant’s on the other. The significance of these errors could perhaps have been minimized'had the parties been a bit more open minded in their approaches to this admittedly *172 novel valuation problem. In claimant’s case, the only explicit recognition that projected income is an element in the subject valuation is the discount factor applied to projected income. Although this single factor presumably encompassed appropriate considerations beyond projected income, the nature and particularly the weight of these considerations was not intuitively obvious from the evidence presented by claimant. In the case of the State, its failure to present at this trial some form of projected income evaluation was even less helpful, particularly in view of the noted indication from the highest court of this State that such an evaluation was appropriate here. Nevertheless, just as we discern no inherent legal infirmity in claimant’s use of a discount factor to reflect considerations beyond projected income, we perceive no conclusive legal error in defendant’s adding an increment to vacant land value to express the value of additional development (see, e.g., Specialty Foods Corp. v State of New York, 46 AD2d 989, and cases cited). We thus find an adequate range presented from which to make a proper finding of value (see Levin v State of New York, 13 NY2d 87, supra), especially since evidence adduced at this trial and proof adopted from the two prior trials provided comparable contrasting evidence to enable the court to evaluate both methods and also provided a range for almost all of the components thereof.
Considering the State’s method first, as indicated, the initial evaluation there was of the net rent of the vacant land. Defendant’s appraiser did this by first finding a total value from comparable sales for subject’s land before demolition, then deducting out the cost of demolition to find a vacant land value and then applying a safe rate of interest to arrive at an economic net rent for the vacant land. Fortuitously, claimant’s appraiser also made a vacant land valuation (albeit not for the same reason as defendant’s appraiser)[1] and he also gave his opinion of what an appropriate rate of interest would be. Additionally, there was evidence of the demolition contract that was in effect when the taking occurred. The land value found by the State’s *173 appraiser was $7,766,433, the demolition cost he used was $420,000 and his interest rate was 6%. Applying these figures, he found a vacant land annual net rental of $440,800. Claimant’s appraiser’s land value was $9,000,000, the demolition contract extant at the time of taking was $375,000 and the interest rate claimant’s appraiser testified to was 7%. Applying these figures to defendant’s method results in a said rent of $603,750. Within this range we believe a vacant land annual net rent of $530,000 is a fair approximation, based on the following analysis.
Both appraisers used five comparable sales and had three in common. While the failure of claimant’s appraiser to appropriately adjust for demolition costs caused his land value before demolition to be inflated, the use by defendant’s appraiser of an attenuated unit value caused an at least comparable undervaluation of his land value.[2] We also found claimant’s plus 10% adjustment to a common sale (Sale 1) to be more convincing than defendant’s minus 10% such adjustment. Considering all the evidence and the range of values presented, we believe $8,500,000 is a fair and reasonable land value before demolition. Since we believe the demolition contract in existence at the time of the taking more accurately reflected the proper demolition expense than such contract used by defendant entered thereafter (that latter contract appeared to have at least in part been influenced by the taking), a $375,000 demolition cost should be deducted to arrive at a vacant land value of approximately $8,125,000. We also believe a rate of return of 6.5% proper rather than a safe rate of 6% since the increase in demand for building space had begun by the time of the taking and this increase was then projected to continue. Applying 6.5% to $8,125,000 gives an annual net vacant land rent of $528,125. Thus, on all the evidence, we believe a land rent of $530,000 more appropriate than defendant’s $440,800.
*174 Turning to the development increment defendant’s appraiser added, we find it grossly inadequate, apparently because he did not consider all the elements of development achieved at the time of the taking and insufficiently valued most of those elements he did consider. The evidence showed that at the time of the taking claimant had accomplished the following in developing the property. First was the lease itself, which, even under defendant’s analysis, would probably generate an annual cash flow or profit of a least $1.67 million when the proposed building was completed (see p 177, infra). Second, claimant had made the guarantee deposit of $1,000,000 required under the lease. Third, claimant had obtained permanent mortgage financing of $30,000,000 at a favorable rate of 5[3]A%. Fourth, claimant had made the guarantee deposit of $230,000 required under the mortgage.[3] Fifth, a construction loan of $23,000,000 had been obtained. Sixth, a demolition contract of $375,000 had been entered. Seventh, a construction contract with a well-respected construction firm had been entered. Eighth, the personal guarantees of claimant’s principals (well-respected real estate and construction men) for demolition of the Old Met and construction of the new building had been given. Ninth, an architectural and engineering contract with a well-respected architectural firm had been entered and 18 sets of building plans had been prepared thereunder, the most recent of which prior to the taking was for a 41-story first class office and showroom building. Tenth, a letter of intent from Chemical Bank, one of the largest banks in New York City, had been given for the lease of approximately 23,500 square feet in the new building. Eleventh, as admitted by defendant’s appraiser, claimant was close to getting letters of intent for the leasing of an additional 175,000 square feet in the building. For these many and varied elements of the development package assembled by claimant, defendant’s appraiser could only find an increment of $69,000. The only elements he attributed value to were the architectural contract and the plans thereunder, the demolition *175 contract, financing (apparently the permanent mortgage and the construction loan, but not the $230,000 deposit under the mortgage) and the letters of intent. The court was not convinced by the State’s evidence concerning the increment (which consisted chiefly of the testimony of defendant’s appraiser) that he sufficiently valued the items he did consider, particularly the financing, and we find it clear from the evidence that the elements he failed to value would have had significant worth to a prospective sublessee. While claimant did not present specific evidence as to what the value of a proper increment would be, we think it may be fairly inferred from the various income projections and other evidence that an increment substantially greater than $69,000 was called for. Thus we believe a proper analysis under defendant’s method would have produced a net annual rental substantially in excess of $600,000 (the sum of the $530,000 land rent found above and defendant’s deficient $69,000 increment) and a final fair rental value substantially greater than $400,000 (two thirds of $600,000, representing the ratio of the eight-month taking period to an annual period).
We now shall consider claimant’s method. It is noted initially that while the State did not prepare any income projections for this trial, it did prepare three separate such projections for use in one of the two prior trials. Although utilized for purposes other than the ascertainment of the rental to be found here (i.e., they were used to show that projected annual cash flow or profits were increased by the taking), they do provide contrasting data for all elements of claimant’s method save the last and most critical element (the discount factor) and defendant’s appraiser supplied testimony as to that factor. Thus, as observed, there is a range as to all elements of claimant’s method.
As discussed, the first part of claimant’s method was the derivation of the projected net rental income that could reasonably have been expected had the taking not intervened. This was done by first projecting a 30-month construction period from the beginning of demolition to the completion of the basic building (i.e., to the top floor, but not including tenant work). This resulted in a projected completion date of November 16, 1968, at which time it *176 was assumed rental income would start to be received. Claimant’s appraiser then used the actual rentals that existed at that approximate time (about 37% of the total building rentals) and projected the rest of the rentals to arrive at a gross rental income. Deductions were then made for vacancies and contingencies, expenses (operating expenses, real estate taxes and ground rent) and debt service to arrive at net rental income.
Dealing first with the 30-month estimate, we note defendant used a 21-month period (albeit for a 41-story versus a 42-story building), claimant’s engineering expert opined a 34- to 38-month period and the construction period for the 42-story building actually built was noted in one of defendant’s appraisals at one of the prior trials as 32 to 39 months. The court observes that if a period slightly longer than 30 months were used, the actual and projected rentals would have been higher. Since we believe the increase in rentals actually experienced during the construction of the building was somewhat higher than what a prospective sublessee would have anticipated at the time of the taking, claimant’s use of a 30-month period most likely resulted in a reasonably accurate projection of rentals as hypothetically viewed from the time of the taking.[4] Also, the 30-month estimate was for construction of a 42-story building and we find that as of the time of taking only a 41-story building was to be reasonably anticipated. We therefore conclude the 30-month estimate resulted in a reasonable time at which to estimate projected rental income.
Nonetheless, as found above, while claimant’s appraiser may have used the right time frame in which to estimate rentals, he used the wrong building. Instead of a 42-story building, he should have based his rental estimate on a 41-story building. This was the basis for defendant’s Plan I income projection and thus we have relied primarily on this projection in establishing a range of values with claimant’s figures. Claimant’s use of the wrong building resulted in an overestimate of gross rental income in the *177 area of $200,000.[5] Thus claimant’s gross income figure should have been somewhat less than $7,800,000, a figure not that far from defendant’s Plan I figure of just under $7,600,000.
Applying claimant’s rate of 5% for vacancies and contingencies results in a corrected effective gross income of less than $7,400,000 and brings us to another significant factual error in claimant’s appraiser’s calculation, to wit, his estimate of operating expenses. He listed $468,000 in income from tenant electric charges, but only $310,000 in electric expenses, a profit of over 50%. Further, that $310,000 in expenses presumably included provision for public electricity, an item which defendant estimated at about $135,000, which works out to an even more exorbitantly excessive profit from tenant charges for electricity. Obviously claimant’s estimate of the electric expense item was grossly inadequate. Considering all the evidence, we believe claimant’s estimate for operating expenses was understated by about another $200,000. This results in an estimate of net income after debt service of about $2,600,000, versus claimant’s original estimate of about $3,000,000.[6]
Reducing this $2,600,000 annual rental income to eight months (see p 175, supra) results in an applicable net rental income before discount of $1,733,000, compared to claimant’s $2,000,000. Applying claimant’s 8.5% discount factor (i.e., .8162) results in a final rental figure of less than $1,415,000, versus claimant’s $1,600,000. Under defendant’s Plan I, its cash flow or annual net rent of $1,677,000 would translate into an eight-month rental *178 income of $1,118,000 and a final rental of $913,000.
As observed, the most critical part of claimant’s method is the discount which was applied to the projected income to translate it into the final rental figure. This discount is supposed to reflect the market value in 1966 that a willing lessor and lessee would have placed on the subject prospective income to be produced two and one-half years later, taking into account not only the fact that such income was future income (i.e., the present value factor), but also that it was income to be derived from a building not yet built although just about to be built (i.e., the risk factor). Claimant’s appraiser contended a return of 8.5%, 2.5% above the then safe or present value rate of 6%, would reflect that value and those factors, or in other words, a sublessee would be willing to pay $1,600,000 in 1966 for the chance to get $2,000,000 two and one-half years later. Defendant’s appraiser considered the risk factor much more significant and gave an offhand estimate of 20% to 25% for a total return rate as being more reflective of what the market would call for. Using a 25% figure would reduce the noted final rentals by about 30% (based on rough computations by the court), giving a range for claimant’s, the court’s and defendant’s figures of $1,138,000, $986,000 and $636,000 respectively for claimant’s method. Of course, it must be remembered that this method is ultimately based on income projections, which are to be considered as an element in ascertaining the final fair rental value, although the application of the discount factor theoretically takes this into account. Thus, despite the mathematical attractiveness of claimant’s method, the court has not relied exclusively on it. Rather, we have considered the above results as providing a range with defendant’s method, as well as being complementary to it in the sense of giving an indication of the increment above mere land value that is reasonable for the stage of development of the property at the time of the taking.
In closing, it is observed that the court doubts the application of other methods or the presentation of more comparable ones would significantly vary the range of values as found herein. The valuation required at bar is of necessity theoretical, involving as it does projections from a time *179 over 14 years ago concerning a taking which was relatively if not totally unique. As we perceive it, our task here is to attempt to justly compensate claimant for the taking that was inflicted on it while at the same time staying within the bounds of accepted eminent domain principles. Hence, while more legally perfect proof or presentation is conceivable, we do not believe justice would be served by requiring it.
Therefore, based on the foregoing and all the evidence in this case, we find the fair rental value of the subject property at and for the duration of the taking to be $800,000. Pursuant to stipulation, claimant’s award is to be reduced by $154,701.11 already received.
Accordingly, claimant is entitled to an award of $645,298.89 for all damages, with interest thereon from September 16, 1966 to November 16, 1966[7] and from May 11, 1968 to the date hereof and thereafter (CPLR 5001, subd [c]).

. Claimant’s expert developed a land value to aid in his determination of his discount factor.

. While both appraisers used a unit value based on the building area permitted by zoning, the State’s appraiser added a 20% bonus to all sales and subject and then an additional 20% to just four of the sales. This second bonus had the effect of reducing the unit value of these sales and appeared unrealistic for at least two of the sales since it postulated building areas in excess of 1.4 and 1.9 million square feet. Buildings of such large size were not shown to be common in the relevant market and the use of the second bonus thus had the effect of unrealistically deflating market value.

. We note the $1.23 million in guarantee deposits would be returned upon successful completion of the project and claimant would receive the interest thereon in the meantime. Nonetheless, the fact these deposits had been made was of value since it was that much less a prospective sublessee would have to come up with.

. We note the partial use of actual rentals in arriving at a gross rental income was not error since what actually occurred is some evidence of what was anticipated to occur at the time of the taking.

. The extra floor had 20,479 square feet and additional extra rental space of 3,326 square feet obtained by enclosure of the mezzanine was not provided for until 1969. Hence, by using the rental space of the building as actually built, claimant’s appraiser overestimated rental space by at least 23,800 square feet. Using claimant’s rental estimates of $7.49/square foot and $8.95/square foot for these areas respectively results in an overestimate in gross income of $183,155. This overestimate in building space also resulted in an additional overestimate of gross income from tenant electric charges by another $11,903 (23,805 square feet at $.50/square foot), for a total overestimate of more than $195,000.

. Claimant’s appraiser’s estimate of real estate taxes did not vary significantly from defendant’s and the farmer’s seemed more appropriately grounded. His use of the actual versus an average ground rent also seemed proper since the taking here carved eight months out of the beginning of claimant’s leasehold, not the end of it or some part in the middle. Finally, claimant’s appraiser’s estimate of debt service appeared more in accord with the actual financing claimant had at the time of taking than defendant’s estimate.

. The damages found here were incurred continuously during the course of the taking period. Hence we deem this an appropriate case to compute interest from “a single reasonable intermediate date.” (CPLR 5001, subd [b].) The court finds such date to be the approximate midpoint of the taking period, namely, September 16, 1966. However, subdivision 1 of section 19 of the Court of Claims Act requires suspension of interest six months after “the accrual” of a claim where filing does not occur until more than six months after accrual. Here the claim accrued when the taking first began, which was when the demolition permit was denied on May 16,1966. Thus the suspension under said section 19 commences six months after that date (Nov. 16, 1966) and ends on the date of the filing of the claim (May 11, 1968).