IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-011

Filing Date: February 20, 2009

Docket No. 30,543

PRIMETIME HOSPITALITY, INC.,

Plaintiff-Petitioner,

v.

CITY OF ALBUQUERQUE,

Defendant-Respondent.


ORIGINAL PROCEEDING ON CERTIORARI
Robert  L. Thompson, District Court Judge

Sutin, Thayer & Browne, P.C.
Kerry Kiernan
Albuquerque, NM

Dennis M. McCary, P.C.
Dennis M. McCary
Albuquerque, NM

for Petitioner

Office of the City Attorney
Robert M. White
Peter S. Auh
Mark Hirsch
Robert Waldman
Albuquerque, NM

for Respondent

OPINION

CHÁVEZ, Chief Justice.

1

**{1}** Primetime Hospitality, Inc. (Primetime) had begun constructing a hotel on its Albuquerque property when it accidentally ruptured an encroaching City of Albuquerque (the City) waterline, causing it to incur excess construction costs and delaying the hotel's opening. The City stipulated to liability for inverse condemnation, admitting that it deprived Primetime of all use and enjoyment of its property for the duration of the taking. As the issue of liability is not before us, the only question we must address is whether Primetime's lost profits and excess construction costs may be awarded as damages in inverse condemnation proceedings. The district court found Primetime's losses to be the direct result of the City's taking and awarded it damages, along with expert witness costs. The Court of Appeals reversed, holding that although lost profits might be considered, the direct award of lost profits in this case would constitute the impermissible award of the full measure of tort damages, and that the portion of the excess construction costs covering Primetime's damage-mitigating buttress wall must be subject to a test of reasonableness. *Primetime Hospitality, Inc. v. City of Albuquerque*, 2007-NMCA-129, ¶¶ 23-26, 35, 40, 142 N.M. 663, 168 P.3d 1087. The Court of Appeals also vacated the award of expert costs. *Id.* ¶¶ 23, 24. We granted certiorari to consider these issues.

**{2}** We hold that in an inverse condemnation proceeding, lost profits may be recovered when they are the best measure of the value of the lost use and enjoyment of condemned land. In addition, in such proceedings, excess construction costs directly resulting from a temporary taking are awardable. Accordingly, we reverse the Court of Appeals and reinstate the district court's award of damages and costs.

## I.    BACKGROUND

**{3}** The facts in this case are not in dispute. Primetime is a New Mexico corporation that develops hotels. It owned land in Albuquerque and had taken significant steps toward building a hotel on its land. Prior to construction, Primetime entered into a license agreement with Hilton Inns that obligated Primetime to construct a Hilton Garden Inn or face $385,000 in liquidated damages. In preparation for construction, Primetime hired an architect to draw up plans and employed a general contractor at a cost of $130,000 each. To finance the hotel's construction, Primetime took out a construction loan of $4,435,000.

**{4}** Not long after construction began in the spring of 2001, Primetime's contractor accidentally breached a 24-inch city waterline, flooding the property. Shortly thereafter, Primetime discovered a 12-inch waterline on the property as well. The City subsequently removed both  waterlines and Primetime sued, seeking damages under New Mexico's inverse condemnation statute, NMSA 1978, § 42A-1-29 (1983), or, in the alternative, for trespass.

**{5}** Before trial, the City stipulated to liability for inverse condemnation and Primetime did not oppose the City's motion to dismiss its trespass claim. The district court then granted partial summary judgment regarding disputed elements of damages, ruling that lost profits "are a proper element of damages with respect to [Primetime's] claims for inverse

2

condemnation in the amount to be determined at trial." At trial, over the City's continuing objection, Primetime and the City presented conflicting expert testimony on the proper measure of lost profits, with the City arguing for a before-and-after method of calculation and Primetime favoring a measure that would compensate it based on calculations of the profits it would have earned had the hotel opened as scheduled.

{6}    At the conclusion of trial, the district court made several findings of fact that are not challenged on appeal. It found that construction was delayed 142 days, that the amount of lost profits due to the delay was $456,242, and that Primetime also incurred additional construction costs in the amount of $153,518.45 due to the delay. The additional construction costs included the costs of repairing water damage, the costs of the delayed construction, and the costs of constructing a buttress wall that had not been in the original design. Addressing the issue of lost profits, the district court concluded that "[w]hen reliable proof of damage and its amount is presented by a methodology other than a before and after appraisal, such proof is admissible on the damage issue," and found that evidence of lost profits was "reasonably ascertainable" with Primetime's methodology. Pursuant to its findings, the district court awarded damages for the additional construction costs and lost profits, and awarded the costs of Primetime's experts.

{7}    The City appealed the district court's decision, claiming that the court erred in awarding lost profits, excess construction costs, and expert fees because such damages are consequential, and thus not recoverable in an inverse condemnation action. *Primetime*, 2007-NMCA-129, ¶ 1. The Court of Appeals affirmed in part and reversed in part. *Id*. Discussing the award of damages for excess construction costs, the Court of Appeals held that generally speaking, repair and restoration expenses should be allowed, to put "the landowner in the same pecuniary position as though the taking had not occurred." *Id.* ¶ 23. Specifically, regarding the buttress wall, the Court of Appeals held that since the wall was an effort to mitigate damages, it was "not strictly required by the City's taking," *id.* ¶ 24, and the district court should have applied a test of "reasonableness under the circumstances" to decide whether it was compensable, *id.* ¶ 26. The Court explained that in condemnation cases, unlike contract or tort actions, mitigation expenses are not per se recoverable, *id.* ¶ 25, but they should not be denied completely, which would undermine a landowner's incentive to reduce losses, *id.* ¶ 26. Thus, the Court of Appeals remanded to the district court to determine reasonableness, perhaps by comparing "the cost of the mitigation effort to the value of the harm averted," taking caution to avoid double recovery. *Id.* ¶¶ 26, 27.

{8}    Next, the Court of Appeals considered the award of lost profits, observing that no single measure of damages could apply in all temporary takings cases. *Id*. ¶ 22. However, finding guidance in federal cases, it held that rental value would be an appropriate measure in this case. *Id*. ¶¶ 37, 38. In defining rental value, the Court of Appeals held that the ultimate question must be "[w]hat would an objective property owner accept to delay construction of a hotel facility in this circumstance for a period of 142 days?" *Id.* ¶ 41. Under this standard, the Court held that lost profits should not be directly allowed, but might be considered as a component of rental value. *Id.* ¶¶ 39-40. As a result, the Court remanded

3

the case to the district court to apply this measure, leaving "the details of the calculation to the parties' accounting and economics experts." *Id.* ¶ 41.

{9} Finally, because the Court of Appeals remanded the case to the district court for a determination of rental value, it vacated the district court's award of expert fees to "allow the judge to redetermine the costs to be awarded once it makes a proper award of eminent domain damages." *Id*. ¶ 45. Thus, it held that, "[i]f the court finds that the expert's testimony is reasonable and necessary because lost profits are part of the mix of information the district court needed, . . . then it may consider awarding the costs . . . ." *Id.* Before this Court, Primetime challenges the Court of Appeals' holdings on lost profits, excess construction costs, and costs. We affirm the district court and reinstate its award of damages and costs.

## II.   DISCUSSION

## A.   STANDARD OF REVIEW

{10} This case first asks us to review, as a matter of law, whether the lost profits and excess construction costs awarded to Primetime were properly compensable in this temporary physical taking. We review these questions of law de novo, without deference to the district court's legal conclusions. *See New Mexicans for Free Enter. v. City of Santa Fe*, 2006-NMCA-007, ¶ 11, 138 N.M. 785, 126 P.3d 1149 ("Interpretation of statutes and constitutional amendments involves questions of law that an appellate court reviews de novo.").

{11} We are also asked to decide whether the district court's award of expert witness costs was proper. This issue is reviewed for abuse of discretion. *Pioneer Sav. & Trust*, *F.A. v. Rue*, 109 N.M. 228, 231, 784 P.2d 415, 418 (1989).

## B.   LOST PROFITS

{12} The district court found that "[a]s a *direct result* of the City's encroaching waterlines and their removal, the opening of the Hilton Garden Inn was delayed for 142 days such that *Plaintiff incurred lost profits from operations for the period June 8 through October 28, 2002*." (Emphasis added.) The City did not challenge either this finding or the finding that the lost profits totaled $456,242. Therefore, the question of whether Primetime's claimed lost profits were an accurate reflection of its loss is not before us. Thus, the district court's findings bind us to the premise that they were. We also emphasize that the district court made no separate award of damages for the property's value in addition to its award of lost profits. We conclude that the district court's award of lost profits was a permissible award to Primetime for the value of its lost use and enjoyment of the land.

{13} The Court of Appeals held that the district court erred in "directly allowing lost profits" because this would amount to an award of "full consequential damages," which the

4

Court found objectionable. *Primetime*, 2007-NMCA-129, ¶¶ 29, 39. Instead, the Court of Appeals proposed a measure of damages based on the property's market rental value, *id.* ¶ 40, which it held should be determined from the perspective of an objective property owner in Primetime's place, *id.* ¶¶ 40-41. In calculating this measure, lost profits could be "taken into account, but only as a component in calculating rental value for the period of delay." *Id.* ¶ 40. We disagree with the Court of Appeals and hold that, under the unique circumstances of this case, lost profits that directly resulted from the City's admitted temporary total taking of Primetime's property are recoverable as just compensation.

{14} The New Mexico Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." N.M. Const. art. II, § 20. A would-be condemnor normally institutes a condemnation proceeding to determine the compensation due, but "[i]f the condemning authority has taken or damaged property for public use without making just compensation therefor or without initiating proceedings to do so, the property owner has recourse through inverse condemnation proceedings." *North v. Pub. Serv. Co. of N.M.,* 101 N.M. 222, 226, 680 P.2d 603, 607 (Ct. App. 1983). In inverse condemnation cases, Section 42A-1-29(A) provides that injured parties denied just compensation shall be entitled to the value of property taken or damaged for a public use "at the time the property is or was taken or damaged, with ten percent per year interest, to the date such just compensation is made." Since the inverse condemnation statute is designed to provide a remedy for violations of the constitutional right to just compensation, *see Garver v. Pub. Serv. Co. of N.M.*, 77 N.M. 262, 270, 421 P.2d 788, 793 (1966) (decided under former law), the propriety of a particular element of damages in an inverse condemnation case is determined by whether that measure provides just compensation for the individualized taking.

{15} Our case law has defined the purposes of just compensation broadly. In *State ex rel. State Highway Commission v. Pelletier*, 76 N.M. 555, 560, 417 P.2d 46, 49 (1966), an appeal of an award of damages in a direct condemnation case, we held that "the compensation to which an owner is entitled is an amount sufficient to cover his loss–that is, to make him whole and fully indemnify him." Different measures of damages give effect to this underlying aim. In permanent total takings cases, New Mexico awards condemnees the fair market value of the property taken as of the date of the taking. *See Moriarty Mun. Sch. Dist. v. Thunder Mountain Water Co.*, 2006-NMCA-135, ¶ 12, 140 N.M. 612, 145 P.3d 92, *aff'd*, 2007-NMSC-031, 141 N.M. 824, 161 P.3d 869. In partial takings cases, NMSA 1978, Section 42A-1-26 (1981) provides that "the measure of compensation and damages resulting from the taking shall be the difference between the fair market value of the entire property immediately before the taking and the fair market value of the property remaining immediately after the taking." In temporary takings cases, however, New Mexico courts have not yet settled the issue of the proper measure of damages.

{16} *PDR Development Corp. v. City of Santa Fe*, 120 N.M. 224, 900 P.2d 973 (Ct. App. 1995) has dealt most directly with this issue, although it concerns a temporary regulatory taking, as opposed to the temporary total physical taking at issue in this case. PDR owned

5

condominiums which it rented on a short-term basis. *Id.* at 225, 900 P.2d at 974. Santa Fe enacted a zoning rule that would prohibit PDR from making such short-term rentals. *Id.* After receiving complaints about PDR's noncompliance, Santa Fe issued cease and desist orders. *Id.* PDR continued renting out its rooms on a short-term basis. *Id.* at 227, 900 P.2d at 976. In addition, at about the same time it received its first cease and desist order, PDR entered into a contract to sell its property, but made the contract "expressly contingent on the lawful use of the property for daily rentals." *Id.* at 225, 900 P.2d at 974. The contract fell through as the conflict dragged on, and PDR's property was eventually foreclosed upon. *Id.* at 225-26, 900 P.2d at 974-75. PDR brought suit, demanding damages for the profit it would have made on the sale. *Id.* at 226, 900 P.2d at 975.

**{17}** The district court found that the City of Santa Fe's actions did not cause PDR's damages, and PDR appealed this finding. *Id.* at 225, 900 P.2d at 974. In reviewing this decision, the Court of Appeals did not directly address the challenged finding, preferring a "broader perspective." *Id.* Citing *Wheeler v. City of Pleasant Grove*, 833 F.2d 267 (11th Cir. 1987), the Court of Appeals held that

> the measure of damages in temporary-takings cases is the market rate of return on the difference in the fair market value of the property without the restriction and the fair market value of the property with the restriction for that period of time during which the restriction was in place.

*PDR*, 120 N.M. at 226, 900 P.2d at 975. Regarding PDR's claim of lost profits, the Court of Appeals held that "[r]ecovery of consequential damages of this sort is not supported by case law." *Id.* at 227, 900 P.2d at 976. The Court went on to explain that "the fair market value measure of damages already takes into account fluctuations in market expectations, including lost future profits." *Id.* To award additional lost profits in this situation would have provided PDR with a double recovery.

**{18}** In *Primetime*, the Court of Appeals held that the market rate of return measure of damages from *PDR* "is not a cure-all." 2007-NMCA-129, ¶ 13. Indeed, the *Primetime* Court acknowledged that given the range of possible temporary takings scenarios, it would not "attempt to create a measure to be used in all temporary takings cases." *Id.* ¶ 22. Instead, drawing inspiration from *United States v. General Motors Corp.*, 323 U.S. 373 (1945) and *Kimball Laundry Co. v. United States,* 338 U.S. 1 (1949)*,* the Court of Appeals settled on a market rental value measure of damages to be determined by asking, "What would an objective property owner accept to delay construction of a hotel facility in this circumstance for a period of 142 days?" *Primetime*, 2007-NMCA-129, ¶¶ 38, 41.

**{19}** Market rental value seems to us to be a reasonable way to measure Primetime's compensable loss under our Takings Clause. As the United States Supreme Court pointed out in *General Motors*, "property" as protected by the Takings Clause denotes "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use

and dispose of it." 323 U.S. at 378.[1] We agree that all of these interests are protected by the just compensation provision of the New Mexico Constitution, and that rental value is a reasonable–if perhaps necessarily vague–measure of the value of temporary use and possession denied Primetime in this case. *See Kimball*, 338 U.S. at 24 (Where the United States had temporarily seized a laundry business's plant, equipment, and staff, that "[p]etitioner has received all that it is entitled to under the Constitution. It has obtained after three years and seven months of use of its plant by the United States a sum of money equal to almost half the market value of the fee. That award was based on the market rental value of the plant."); *Gen. Motors,* 323 U.S. at 382 (concluding, in case concerning the seizure of a warehouse, that the proper measure of damages is "what would be the market rental value of such a building on a lease by the long-term tenant to the temporary occupier"); 2 Dan B. Dobbs, *Dobbs Law of Remedies* § 6.9(2), at 182 (2d ed. 1993) ("Under traditional rules of compensation for takings of property, if the property was taken completely for a period of time, rental value for that period was the appropriate measure."); J. Margaret Tretbar, *Calculating Compensation for Temporary Regulatory Takings*, 42 U. Kan. L. Rev. 201, 205 (1993) ("Generally, compensation for temporary physical takings has been determined by estimating the fair rental value of the property interest taken for the duration of the taking." (footnote omitted)).

{20}     In the case at bar, the identification of rental value as the measure of damages raises as many questions as it answers. Chief among them is the question of whether rental value should reflect the value of the land to a third party in its condition at the time of the taking–partially excavated and possibly worth less than at the time of purchase–or whether rental value should instead take into consideration the revenue that the unfinished hotel could have produced 142 days earlier were it not for the delay. Had Primetime's land been completely undeveloped, and had Primetime taken no steps to set its plan of building a hotel in motion, it would receive as compensation for a temporary physical taking nothing more than the market rental value of the empty land, determined, for example, by similar sales. *See United States v. 883.89 Acres of Land*, 442 F.2d 262, 265 (8th Cir. 1971) (affirming the trial court's award of the market value of temporarily seized undeveloped land based on "like and comparable sales [of pasture land] within a reasonable time preceding the condemnation," and approving the trial court's refusal to consider speculative evidence of the land's value as commercial property (internal quotation marks and citation omitted)). The market rental value of the land would reflect its realistic income-producing potential. *See Kimball*, 338 U.S. at 9 ("The market value of land as a business site tends to be as high as the reasonably probable earnings of a business there situated would justify."). If, on the other hand, Primetime's hotel had already been constructed, rental value could be determined with reference to the specific earnings normally generated by the hotel, since this

---

[1]Like the Court of Appeals, we turn to federal cases for guidance, since "[o]ur state Constitution provides similar protection" to the Takings Clause in Amendment V of the United States Constitution. *Moriarty Sch. Dist. Bd. of Educ. v. Thunder Mountain Water Co.*, 2007-NMSC-031, ¶ 8, 141 N.M. 824, 161 P.3d 869.

data would take the place of the market's approximation of the income-producing potential of the land. *See, e.g.*, *United States v. 37.15 Acres of Land*, 77 F. Supp. 798, 801 (D. Cal. 1948) (awarding, in a case regarding the United States' temporary total physical taking of an operating hotel, damages based on the record of the hotel's earnings, with adjustments based on market conditions). In both of these examples, it is easy to envision an actual rental transaction between Primetime and a third party. This is not so in our actual case. Having invested heavily in its project, Primetime, if asked to rent its property, would likely charge much more than a third party would be willing to pay to rent a partially excavated vacant lot.

**{21}** To make our market rental value measure comprehensible in this unusual case, we must determine the perspective from which the value will be ascertained. The district court's findings and conclusions clearly imply that it considered the loss to the property owner to be the appropriate focus. The Court of Appeals agreed, observing that "[s]ince the goal of just compensation is to measure and pay for what the owner has lost, we must analyze this question from Primetime's viewpoint." *Primetime*, 2007-NMCA-129, ¶ 38. This led the Court of Appeals to clarify the concept of rental value in this specific circumstance as implying the determination of what an objective property owner in Primetime's place would have accepted *Id.* ¶ 41.

**{22}** We agree that it is the loss to the condemnee which must guide a court's determination of fair rental value, especially in cases of temporary takings. *See*, *e.g.*, *Kimball*, 338 U.S. at 13 (The Court held that the government must compensate a condemnee for going concern value if it has deprived the landowner of it, "whether or not it chooses to avail itself of [the going-concern value]. Since what the owner had has transferable value, the situation is apt for the oft-quoted remark of Mr. Justice Holmes, 'the question is, What has the owner lost? not, What has the taker gained.'" (citation omitted)). In other words, the definite plans of a property owner are a proper consideration in determining the value of the taking. *See State ex rel. State Highway Dep't of N.M. v. Kistler-Collister Co.,* 88 N.M. 221, 224, 539 P.2d 611, 614 (1975) ("In the case now before us, we have property already developed for commercial uses with definite plans and provisions in the existing structure having been made for the future development of the property for these uses. . . . The appraisers correctly considered these plans, and the consequent uses to which the property could be put, in arriving at their respective appraisals of the damages suffered by [the condemnee].").

**{23}** In the Court of Appeals' judgment, however, the district court failed to use its objective person measure when it awarded Primetime its lost profits. *Primetime*, 2007-NMCA-129, ¶ 45. From the perspective of the Court of Appeals, lost profits–although they may be considered in determining rental value–are consequential damages if awarded "directly," except, apparently, in "true business interruption" cases. *Id.* ¶¶ 29, 39-40. As was the case with excess construction costs, we believe that the Court of Appeals, while thoughtful in its discussion, was bound by the district court's findings to come to a different conclusion. In this case, as demonstrated by the district court's unchallenged findings, the lost profits awarded to Primetime were an award of the land's rental value. Therefore, we

see no need to remand this case to the district court to determine the property's rental value during the period of the taking.

**{24}**    We recognize, however, that lost profits may be considered consequential damages, and that there are different opinions regarding whether consequential damages are recoverable in inverse condemnation proceedings. *Compare Gen. Motors,* 323 U.S. at 379-80 ("The sovereign ordinarily takes the fee. The rule in such a case is that compensation for that interest does not include future loss of profits . . . or other like consequential losses . . . . Even where state constitutions command that compensation be made for property 'taken or damaged' for public use, as many do, it has generally been held that that which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage." (footnote omitted)), *with State v. Hammer*, 550 P.2d 820, 824-25 (Alaska 1976) (rejecting the non-compensability of consequential damages such as lost profits because not awarding them "fails to provide a realistic measure of what has been taken" and exaggerates concerns about speculativeness). *See generally* Emerson G. Spies & John C. McCoid, II, *Recovery of Consequential Damages in Eminent Domain*, 48 Va. L. Rev. 437, 449 (1962) ("Fundamental fairness dictates that individuals who suffer consequential loss ought to be compensated.  In disallowing recovery for many such losses the law is unfair in two different but related respects.  First, it discriminates between those on whom loss from eminent domain falls.  Some are compensated; some are not.  Secondly, it requires those who suffer uncompensated injuries to bear directly and in undue proportion the economic expense of projects designed to benefit the public.").

**{25}**    Drawing a clear distinction between consequential and non-consequential damages is no easy task.[2] *Black's Law Dictionary* defines "consequential damages" as "[l]osses that *do not flow directly* and immediately from an injurious act but that result indirectly from the act." *Id.* at 416 (8th ed. 2004) (emphasis added).  Similarly, it defines "consequential loss" as "[a] loss arising from the results of damage rather than from the damage itself." *Id.* at 964.  *PDR* indicates a similar understanding, explaining that "this case involves a public body's enforcement of a general zoning law that had consequential effects on PDR's contracts."  120 N.M. at 227, 900 P.2d at 976.  PDR's contracts were not directly affected by the zoning ordinance; rather, it was PDR's land that was affected, and it was the value of that land that the *PDR* Court properly measured to award damages.  *See id.*

---

[2]However, we note our agreement with the Court of Appeals that some New Mexico eminent domain cases use the term "consequential damages" to refer specifically to injuries to adjacent property, such as loss of access to roads, when a parcel of land is taken. *See, e.g.*, *Publ Serv. Co. of N.M. v. Catron*, 98 N.M. 134, 136, 646 P.2d 561, 563 (1982); *Hill v. State Highway Comm'n*, 85 N.M. 689, 690, 516 P.2d 199, 200 (1973); *Bd. of County Comm'rs of Lincoln County v. Harris*, 69 N.M. 315, 317, 366 P.2d 710, 712 (1961).  This is not the sense of "consequential damages" that concerns us here.

**{26}** In this case, the district court made the unchallenged finding that "as a *direct result* of the City's encroaching waterlines . . . . Plaintiff incurred lost profits . . . ." (Emphasis added.) This description is clearly at odds with the definition of consequential damages in *Black's Law Dictionary* and is easily distinguishable from *PDR*, in which the district court found that PDR's injury was not directly caused by the City of Santa Fe. Moreover, even if causation had been established in *PDR*, the causal connection was more attenuated than it is in *Primetime,* according to the unchallenged findings of the district court. Given the district court's findings, our rules of appellate procedure weigh in favor of holding the lost profits damages to be non-consequential. Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked . . ."). However, the issue of lost profits merits a closer look, given the cases that seem to disallow awards that are, at first glance, similar to Primetime's. We have already pointed out the distinction between lost profits in *Primetime* and *PDR*, the primary New Mexico case. We now consider cases from other jurisdictions.

**{27}** In a number of leading cases, recovery of lost profits has been denied not (as sometimes claimed) because the lost profits were consequential, but for other reasons that are inapplicable to *Primetime*. In *Wheeler*, the case from which the *PDR* Court derived its measure of damages, a property owner and the development company to which it had intended to sell its land sought damages in inverse condemnation after a local ordinance unconstitutionally attempted to deny their right to build an apartment complex. 833 F.2d at 268-69. The district court judge eventually awarded the property owners only nominal damages and awarded the development company compensation for preparatory construction costs and temporary financing costs. *Id.* at 269. The judge refused, inter alia, to award lost profits to the development company. *Id.* at 269-70. Affirming this denial of lost profits, the Eleventh Circuit began by acknowledging that "[i]n the case of a temporary regulatory taking, the landowner's loss takes the form of an injury to the property's potential for producing income or an expected profit." *Id.* at 271. The court then stated the "market rate of return" measure later appropriated by *PDR,* and explained that to award lost profits after using this measure "would be to award double recovery." *Id.*

**{28}** This situation is readily distinguishable from *Primetime*, in which neither the parties nor the courts have advocated the "market rate of return" measure, rendering the *Wheeler* court's specific concern about double recovery irrelevant. It is, however, true that if we were to remand this case for a determination of rental value, it would pose a risk of double recovery if lost profits were to be awarded in addition to rental value. This is readily apparent by considering the hypothetical posed above about the temporary taking of an operating hotel; in that case, lost profits would be a means of determining rental value and would not be awarded separately. Avoiding this concern, as we discuss below, we conclude that a remand is not required to determine a separate and additional measure of rental value.

**{29}** Other cases have denied lost profits out of a concern that they are too speculative. In *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1578 (Fed. Cir. 1990), Yuba demanded just compensation after the Army Corps of Engineers improperly denied its

10

right to exploit certain mineral rights. Yuba claimed that this interference had cost it the opportunity to obtain royalties at a time when gold prices were higher; in other words, it claimed lost profits. *Id.* at 1580. Crucially, however, Yuba still had possession of its gold after the taking. The United States Claims Court compensated Yuba for the property's rental value, but refused to award it lost profits. *Id.* The Federal Circuit affirmed, stating in broad terms that lost profits, as a form of consequential damages, are "not an appropriate element of just compensation for the temporary taking of property." *Id.* at 1581-82. However, a closer look at the Court's opinion suggests that more is at stake. In explaining its holding and distinguishing *Kimball*, the Court wrote that "there was no existing business or going concern that the government took. There was only a proposed agreement which, had there been no taking, presumably ultimately would have developed into an existing mining operation. Even that was not certain . . . ." *Id.* at 1582. Further, "any attempt to determine how much gold would have been extracted during the taking period, and what its net sales price would have been, would involve the very kind of conjectural and speculative analysis the courts consistently reject." *Id.* at 1583. Once again, the denial of damages was not because the condemnee's lost profits were consequential per se, but because the case suffered from other infirmities.

{30}    We agree that speculative damages should be excluded from just compensation awards. *See, e.g.*, *Kistler-Collister Co.*, 88 N.M. at 223-24, 539 P.2d at 613-14 (The Court held that there was no error in the trial court's admission of evidence of future plans for a condemned property, with the proviso that "mere frustration of the owner's hopes or plans for the future is a noncompensable element of damages"); *Pelletier*, 76 N.M. at 562, 417 P.2d at 50 (holding that while it was not error for a trial court to allow testimony on potential uses of property, "[t]he projected use to be considered as an element in arriving at value should be not only possible, but reasonably probable. It must not be based upon mere speculation that at some time in the distant and remote future a particular use might be made of the property."). In *Primetime*, the unchallenged findings of the district court preclude any argument that Primetime's lost profits were speculative.

{31}    Some courts go further and hold that certain non-duplicative, non-speculative lost profits awards should be denied solely for the reason that they are consequential. In *Mitchell v. United States*, 267 U.S. 341, 343 (1925), for example, the plaintiffs' corn cannery had been seized by the United States, and the plaintiff was unable to restart the business at an alternative location since there was no other feasible land available. The plaintiffs were awarded damages "[f]or their land, appurtenances, and improvements," but not for loss to their business. *Id.* As the Court explained, it would be improper to consider

>consequential damages for losses to their business, or for its destruction. No recovery therefor can be had now as for a taking of the business. There is no finding as a fact that the government took the business, or that what it did was intended as a taking. If the business was destroyed, the destruction was an unintended incident of the taking of land.

11

*Id.* at 345 (citations omitted).

**{32}**    Although *Mitchell* seemingly condemns the award of even ascertainable lost profits when they constitute consequential damages, we do not believe that *Mitchell* can be read to proscribe every award of lost profits.  The Court of Appeals itself held in *Primetime* that lost profits may be considered in determining the value of temporarily seized property, 2007-NMCA-129, ¶ 40, and we have found ample cases to support this proposition.  For example, in *Keystone Associates v. State*, 371 N.Y.S.2d 814 (Ct. Cl. 1975), the construction of the plaintiff's office building was delayed by an unlawful statute, and the plaintiff sought compensation for lost profits it would have derived from renting its office space.  Lost profits were eventually awarded and the award was appealed.  In a dissent to the appellate court's decision that was later adopted as controlling law, Justice Greenblott argued  that "[w]hile potential profits themselves would be an inappropriate measure of damages, projected return on the basis of development plans suitable to the property could be taken into account by experts, together with the other figures cited, in determining fair rental value."  *Keystone Assocs. v. State*, 389 N.Y.S.2d 895, 899 (App. Div. 1976) (Greenblott, J., concurring in part and dissenting in part); *see also Keystone Assocs. v. State*, 383 N.E.2d 560, 560 (N.Y. 1978) (adopting Justice Greenblott's opinion).  In applying this measure on remand, the Court of Claims simply added a discount factor–designed to reflect the uncertainty involved in the office building's completion–to its earlier calculation of lost profits.  *Keystone Assocs. v. State*, 433 N.Y.S.2d 695, 700 (Ct. Cl. 1980); *see also Anderson v. Chesapeake Ferry Co.*, 43 S.E.2d 10, 19 (Va. 1947) (The Court held that, in a case involving Virginia's temporary seizure of a ferry company whose striking employees were disrupting travel, "[t]he fair rental value to which the ferry company is entitled is to be determined with reference to the value of its properties at the time of the taking, and their earning capacity under all the facts and circumstances existing at the time of the taking."); *Brooklyn E. Dist. Terminal v. City of New York*, 139 F.2d 1007, 1013 (2d Cir. 1944) (In a case regarding the permanent taking of freight terminal facilities, that "[l]oss of business profits as such is not allowable, but in default of more direct evidence of sale value, present value (i.e., as of the time of taking) of clearly to-be-expected future earnings may be considered." (citation omitted)).  Thus, the Court of Appeals was correct that lost profits can be considered in assigning rental value.  However, this lost profits plus approach is not the only possible approach.  Where a court finds that lost profits are the best evidence of the taken property's value, regardless of whether explicitly characterized as rental value, they should be the measure of just compensation.

**{33}**    Such was the case in *Primetime*.  First of all, in *Primetime*, there is an unchallenged finding of fact that, in essence, the government took Primetime's business, directly preventing it from making nearly $500,000.  *Cf. Kimball*, 338 U.S. at 12-13 (The Court held, in a case regarding the government's taking of a laundry, that whereas going concern value would not normally be awarded and cannot be considered double recovery in a permanent takings case, "[t]he Government's temporary taking of the Laundry's premises could no more completely have appropriated the Laundry's opportunity to profit from its trade routes than if it had secured a promise from the Laundry that it would not for the duration of the

12

Government's occupancy of the premises undertake to operate a laundry business anywhere else in the City of Omaha."). Second, the lost business damages requested in *Primetime* are the *only* measure of the use and possession of the plant that has been awarded. Third, the lost profits injuries claimed in *Primetime* are direct, not attenuated as in *Mitchell*, in which the lost profits were ultimately caused by the government's seizure of *other* land. *See* D. Michael Risinger, *Direct Damages: The Lost Key to Constitutional Just Compensation When Business Premises Are Condemned*, 15 Seton Hall L. Rev. 483, 508 (1985) (discussing how, in *Mitchell*, "the 'destruction of their business' [plaintiffs] were asserting was not the result of the taking of their canning factory property *per se* . . . ."). In sum, Primetime's lost profits were the direct result of the taking of its property. The district court's award was non-speculative and strictly temporally limited to the value of the lost 142 days; the value of the use of the property for these 142 days was the value of opening 142 days earlier than the hotel actually did and the profits this would have entailed. Further, the lost profits did not supplement any other award of damages for the land's value; in other words, if plaintiff's lost profits were consequential damages–damages external to the injury to the land–then Primetime received zero compensation for the land itself.

{34}     Where lost profits are so direct a measure of the value of the temporary taking–just as they would be for an operating hotel–it is unnecessary to remand to the district court to re-award the same lost profits under the guise of calculating rental value. The district court found that lost profits were the best evidence of the measure of the property's value, which the City admitted it had inversely condemned:

> 2. The New Mexico Constitution, as well as the inverse condemnation statute, mandates compensation both when a governmental action results in a taking and when such action *damages property*.

> 3. When *reliable proof of damage* and its amount is presented by a methodology other than a before and after appraisal, such proof is admissible on the damage issue.

> 4. "Property" refers not only to the physical object itself, but to the group or bundle of rights granted to the property owner, including the right to the *use and enjoyment* of the object.

(Emphasis added.) This does not suggest that the district court intended to award purely consequential lost profits, but rather to use lost profits to measure the injury to Primetime's property, defined correctly to include use and enjoyment.

{35}     In this context, we disagree with the Court of Appeals' holding that the district court's award did not satisfy its objective person fair rental value measure of damages. The award of lost profits seems to us to be intended as a measure of the lost use and possession of the property; in other words, it *is* a measure of rental value. It is the answer to the Court of Appeals' question about what an objective property owner would accept to delay this

13

project for 142 days; the answer being, as rental value, the profit the owner would reasonably expect to make during that same period of time. In other words, it seems to us that the trial court already answered the question to be posed on remand, making remand superfluous under the circumstances.

**{36}** The absence of the words "rental value" in the district court's order will not prevent us from finding that this was the measure of damages, since all other signs are consistent with such a conclusion. We do not decide whether, in other circumstances, lost profits might not accurately reflect this value, or might have to be modified, as in *Keystone*, to accurately reflect rental value. 433 N.Y.S.2d at 700. However, just as it is acceptable for lost profits to be considered in determining rental value, we see nothing preventing lost profits from being the sole factor in determining rental value when appropriate. Given the findings of the Court of Appeals, this is just such a case. The district court's award of lost profits is affirmed.

## C.    EXCESS CONSTRUCTION COSTS

**{37}** Primetime sought compensation for the following amounts as excess construction costs.

| | |
|---|---|
| Admin. Time | 5,000.00 |
| Buttress Wall | 76,856.94 |
| Hussein Salary | 37,864.14 |
| Mayan Construction | 23,196.77 |
| LSC Landscaping | 1,465.50 |
| Cartesian | 507.04 |
| Custom Grading | 5,400.00 |
| Vineyard | 502.61 |
| Builders Risk | 1,089.14 |
| Pat Richardson | 1,236.64 |
| Fence | 400.00 |
| Total: | 153,518.45[3] |

**{38}** The district court found that "[a]s a *direct result* of the City's encroaching waterlines, [Primetime] incurred additional construction costs *it would not have otherwise been required to spend* in the amount of $153,518.45." (Emphasis added.) This finding is not challenged by the City. Instead, the City argued on appeal that these expenses represent consequential damages not recoverable in New Mexico in an inverse condemnation proceeding. *Primetime*, 2007-NMCA-129, ¶ 1.

**{39}** Without directly answering whether these excess construction costs were

---

[3]The sum of these amounts is actually $153,518.78, but the figure cited above has been used throughout these proceedings.

consequential damages, the Court of Appeals upheld all of the expenses awarded by the district court with the exception of the buttress wall as excess construction costs incurred as the direct result of the taking. *Id.* ¶¶ 23-24. The Court of Appeals reasoned that these costs were imposed on Primetime by the City and were similar to the repair and restoration expenses allowed in *General Motors* and *Kimball*, and the special damages allowed in partial takings cases in New Mexico under UJI 13-705 NMRA. *Primetime*, 2007-NMCA-129, ¶ 23.

{40}     The Court of Appeals singled out the expenses for the buttress wall, finding that the expenses were not "strictly required by the City's taking." *Id.* ¶ 24. The Court of Appeals agreed that these expenses represented an effort by Primetime to mitigate its damages. *Id.* However, the Court of Appeals correctly declined to invalidate the damages simply because they might represent an effort to mitigate harm. *See id.* ¶ 25. The Court of Appeals reasoned that to disallow all awards for mitigation efforts would discourage remedial efforts designed to reduce losses. *Id.* As a result, the Court of Appeals concluded that where costs are incurred to mitigate damages caused by a temporary physical taking, courts must apply a test of reasonableness under the circumstances to determine whether the costs of mitigation were justified. *Id.* ¶ 26. The Court of Appeals believed that the district court had not fully demonstrated whether the cost of the buttress wall was reasonable, and remanded for this determination. *Id.* ¶¶ 25-26.

{41}     We agree with the Court of Appeals' basic holding that remedial construction costs are awardable in condemnation cases when they are the direct result of the taking. In temporary takings cases, the government must compensate for the losses resulting from damage to the condemnee's property. *See, e.g.*, *General Motors*, 323 U.S. at 384 (holding that the lost value of damaged or destroyed fixtures or permanent equipment is compensable); *Eyherabide v. United States*, 345 F.2d 565, 570 (Ct. Cl. 1965) ("The measure of plaintiffs' recovery is for the temporary taking . . . . This standard, differing somewhat from that applicable where a full interest is acquired, allows not only compensation for the use and occupancy of the property but also for the loss of improvements and the cost of placing the property in its pre-taking condition (if it has diminished in value)."). Thus, any construction costs necessary to put Primetime in the position it would have been in had no taking occurred are compensable in this temporary taking.

{42}     In this case, the characterization of the damages for the buttress wall as mitigation damages is not necessary to determine whether they were compensable. The question is whether such expenses were the direct result of the City's admitted inverse condemnation of this property. If so, such damages should be recoverable as just compensation. The district court's unchallenged finding was that the excess construction costs, including the buttress wall, were a direct result of the City's admitted inverse condemnation. Primetime built the buttress wall for the sole purpose of making up for time lost due to the City's actions. Thus, its expenses are compensable.

{43}     Of course, the expenses must also be reasonable, as the Court of Appeals correctly

observed. We note that at trial, uncontradicted testimony was elicited that the buttress wall had reduced construction time by about a month. Primetime points out that since the loss for 142 days was $456,242, the loss for 30 days, calculated by taking the average loss for each day, came to $96,386.15, a significantly higher sum than the $76,856.94 spent on the buttress wall. Therefore, there is substantial evidence in the record demonstrating the reasonableness of this expenditure to reduce delay and its concomitant cost to the City. We need not remand to the trial court to restate what appears well-supported in the record. Accordingly, we affirm the district court's award of $153,518.45 for excess construction costs.

## D.   COSTS

**{44}**   We agree with the Court of Appeals that there was no abuse of discretion in awarding costs to Primetime under Rule 1-054(D)(1) NMRA and NMSA 1978, Section 38-6-4(B) (1983). Further, given our conclusion that the district court's award of lost profits satisfied the Court of Appeals' legal standard, we hold that Primetime's expert testimony was reasonably necessary, and as such should be recompensed. The district court's award is therefore reinstated.

## III.   CONCLUSION

**{45}**   We reinstate the district court's awards of lost profits, excess construction costs, and expert costs.

**{46}   IT IS SO ORDERED.**

**EDWARD L. CHÁVEZ, Chief Justice**

**WE CONCUR:**

**PATRICIO M. SERNA, Justice**

**PETRA JIMENEZ MAES, Justice**

**RICHARD C. BOSSON, Justice**

16

_____
 CHARLES W. DANIELS, Justice


**Topic Index for _Primetime Hospitality, Inc. v. City of Albuquerque_ , No. 30,543**

**AE**          **APPEAL AND ERROR**

AE-AR          Appellate Review

**CP**          **CIVIL PROCEDURE**

CP-EX          Expert Witness Fees

**CT**          **CONSTITUTIONAL LAW**

CT-TC          Taking Without Compensation

**GV**          **GOVERNMENT**

GV-ET          Eminent Domain

**JM**          **JUDGMENT**

JM-CS          Costs

**PR**          **PROPERTY**

PR-IC          Inverse Condemnation

**RE**          **REMEDIES**

RE-CD          Compensatory Damages

RE-CQ          Consequential Damages

RE-CS          Costs

RE-DG          Damages, General

RE-LF          Lost Profits

RE-MD          Measure of Damages